**UNIVERSE TANKSHIPS, INC., as owner of the SS ORE CHIEF**

v.

**UNITED STATES of America.**

**Civ. A. No. 41815.**

United States District Court,
E. D. Pennsylvania.

Dec. 19, 1974.

Alfred J. Kuffler, Richard W. Palmer, Philadelphia, Pa., for plaintiff.

Thomas L. Jones, Admiralty & Shipping Sec., U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

HUYETT, District Judge.

This case requires that we scrutinize the degree of care employed by the government in surveying the depths of navigable waters of the Delaware River. The factual context in which we make this examination of defendant's conduct arises from the grounding of the bulk ore carrier S.S. Ore Chief on January 3, 1965. At approximately 11:39 A.M. on that date the Ore Chief went aground in the vicinity of the Delaware River off Pier 77 North which is to the north of the Benjamin Franklin Bridge on the Pennsylvania side of the river.

Plaintiff's evidence sought to demonstrate that the Ore Chief's grounding was caused by the impact with two large rocks indigenous to the river bottom and located from 125 to 140 feet off Pier 77 N. These rocks were described in the record as the "log rock" and the "table rock." The log rock was characterized by a piling wedged in the rock. The table rock was described as a flat-surfaced rock as compared to the irregularly shaped log rock. Plaintiff's theory was that prior to coming into contact with the Ore Chief these rocks had a depth of only 25 to 35 feet of water from their highest point to the surface of the Delaware River at mean low water. Since at the time of the grounding, the Ore Chief's draft (the distance from the bottom of the ship to the point at which the surface of the water meets the top part of the ship) was 37 feet, a collision with the rocks was inevitable. The government's liability is asserted to result from its publishing of channel depth statements which indicated an unobstructed depth at mean low water of thirty-seven and one-half (37.5) feet in the area where plaintiff's evidence purports to show the Ore Chief went aground.

For its part the government at trial made no attempt to show what caused the Ore Chief to go aground. Nor did the government seek to prove where the grounding occurred. It simply attempted to demonstrate the lack of any convincing evidence in support of plaintiff's theory.

While we consider the evidence supporting plaintiff's theory of the case to be substantial, we have concluded, after a careful consideration of the nature and quality of plaintiff's evidence, that plaintiff has failed to prove it more probable than not that the Ore Chief went aground in a collision with rocks the water above which had a depth less than that reported by the government in

its notices to mariners. We will, therefore, enter judgment in favor of the government.

## FINDINGS OF FACT

1. Jurisdiction over the parties and the subject matter herein is conferred upon this court pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741 to 752 (1970).

2. The River and Harbor Act of September 3, 1954 (P.L. 780, September 3, 1954, Ch. 1264, Title I, 68 Stat. 1248) authorized the deepening and widening of the channel in the Delaware River from the Navy Yard to Allegheny Avenue, Philadelphia, and to the upstream end of Newbold Island. The channel was to be deepened to a depth of 40 feet and widened to a width of 1000 feet.

3. The channel in the Delaware River is now 1000 feet wide. At Pier 77N the 1000 foot channel's westerly edge is 50 feet from the pier. The 40 foot project depth is the westerly 400 feet of the channel. The remaining 600 feet is a project depth of 37 feet. For purposes of surveying, the channel is also divided into 1000 feet stations from North to South of the river. The zero point of the stationing is at a point opposite Allegheny Avenue. A reference to 7 plus 000, or 7000, indicates the point 7000 feet below Allegheny Avenue. Pier 77N is at station 7+000. (N.T. 4–101)

4. Reach D is an area of the Delaware River north of the Benjamin Franklin Bridge approximately between Pier 61 to the downstream of the river and Pier A at Port Richmond to the upstream of the river. (N.T. 414; Pl.Ex. 42)

5. On channel depth statements issued by the government the area of Reach D where the Ore Chief is claimed by plaintiff to have grounded is referred to as the Philadelphia-Camden Bridge to Cumberland Street, Philadelphia area. (N.T. 4–81; Pl.Ex. 37)

6. Dredging for the purpose of deepening the channel to 40 feet for a width of 400 feet in the area known as Reach D above the Benjamin Franklin Bridge was completed in April of 1960. (N.T. 4–76)

7. The dredging operation was performed pursuant to a bid contract with the American Dredging Company. (N. T. 4–76) During the period relevant to this action, the Army Corps of Engineers' practice was to survey the areas dredged after the dredging company had certified completion of the contract requirements. (N.T. 4–99, 4–103)

8. There are generally four methods of conducting surveys of the depth of a river. One method is by means of electronic depth recorders. (N.T. 4–88) The recorders transmit an electronic impulse to the bottom of the river which bounces off the bottom and comes back up. (N.T. 4–89) It is estimated that a recording will cover a floor area of the river to a width of 15 to 20 feet. (N.T. 92g)

9. Another method of surveying is the sweep bar method. Sweep surveys are conducted by suspending a bar on a pipe at a known depth and drifting with the current perpendicularly to the longitudinal axis of the channel and in this way determining that a particular area is clear to a certain depth. If the suspended bar hits something, there obviously exists a spot shallower than the depth at which the bar is suspended. (N.T. 4–94)

10. At the time pertinent to this case the bar used for the surveys had a width of 110 feet. Thus, the area swept at any one time was 110 feet. (N.T. 4–95)

11. The accuracy of the results obtained with the sounding method is comparable to the accuracy of the results obtained with the sweep method. (N.T. 4–97)

12. Another method used in surveying is the wire drag survey. In a wire drag a wire is suspended from floats at a predetermined depth and dragged by two vessels. The wire drag is used to discover if there are any large obstructions. It is used to cover a very large area of from 3000 to 4000 feet. The wire drag method was not used by the

Army Corps of Engineers in the 40 foot project depth surveys. (N.T. 4–98)

13. Yet another method of surveying is by lead line soundings. This method involves putting a weight on the end of a line and dropping it until it hits something. A measurement of the line is then taken. Lead line soundings are done at 10 foot intervals. (N.T. 4–108)

14. Upon completion of the 40 foot project depth in April 1960, the government surveyed by sweep bar method the entire area in Reach D. (N.T. 4–99)

15. Although the project depth was required to be cleared only to 40 feet, the government cleared the depth to 42 feet. The additional two feet assures a clear project channel and eliminates the necessity of dredging in the immediate future to remove recently accumulated material. (N.T. 4–106)

16. On at least six occasions sweeps were made of the project area in the station off Pier 77N. (N.T. 4–100 to 4–118; Pl.Ex. 47 to 47e) On each occasion some four sweeps were made, (N.T. 4–118) with an overlap in the sweep of an area of 10 to 20 feet.

17. After completion of the project depth in April 1960 until the Ore Chief grounding on January 3, 1965, no other bar sweeps of the entire 400 foot channel off Pier 77N were made. (N.T. 4–124)

18. For purposes other than dredging a sweep bar survey is impractical; electronic soundings are more than adequate. (N.T. 6–8, 9 and 54) Because of tide conditions sweep surveys cannot be used as frequently as soundings. (N.T. 6–13)

19. Two bar sweeps were made on January 5 and 9, 1965. The area was swept to 40 feet in Reach D. The entire area was found to be clear to 40 feet. (N.T. 135–36) (Pl.Ex. 14A which is also numbered 15)

20. Sounding surveys were made in October 1961 (Pl.Ex. 52), November 1962 (Pl.Ex. 51), August 1963 (Pl.Ex. 50), and November 1964 (Pl.Ex. 12).

21. The results of these soundings were as follows:

## REFERENCES ARE TO THE 40′ X 400′ CHANNEL *

|  | ₵ Sta. | West Edge | 100′ E. of W. L. | ₵ | 100′ E. ₵ | East Edge |
|---|---|---|---|---|---|---|
| P–12 3 Nov. '64 | 7+000± | 41.9 | 43.3 | 44.0 | 43.2 | 45.1 |
| P–50 30 Aug. '63 | 6+800± | 41.0 | 44.0 | 44.1 | 46.0 | 43.0 |
| P–51 1 Nov. '62 | 6+760± | 42.8 | 45.5 | 45.9 | 44.5 | 44.7 |
| P–52 20 Oct. '61 | 7+180± | 42.0 | 45.7 | 44.8 | 46.5 | 33.0 |
|  | 6+600± | 40.8 | 42.5 | 42.4 | 41.7 | 39.2 |

* The symbol ₵ means centerline and refers to the reference station established by the Corps in the center of the channel.

———◆———

The shallowest sounding in the 40 foot project was 40.8 feet demonstrating that no obstruction existed. (Pl.Ex. 53)

22. The October 1961 and November 1964 surveys found two shoals, but neither shoal was in the 40 foot project depth. (N.T. 4–137) In addition, these shoals did not present an obstruction to navigation and would not have led a reasonable person to require sweep bar sur-

veys of the entire Reach D area. (N.T. 4–124; 4–143–44) The 33 foot shoal was not even within the 40 foot channel. (N.T. 6–47–8) The testimony of Murphy, plaintiff's expert, that notice of these shoals would require sweep bar surveys is unpersuasive. (N.T. 6–89–95) Such a standard demands perfection and is not reasonable in view of the location and nature of these shoals.

23. On January 3, 1965, the SS Ore Chief, a Liberian flag bulk ore carrier vessel of 20,910 gross tons, was 794 feet in length, 116 feet 5 inches in width, 38 feet 8½ inches in depth and was powered by two turbo-drive geared screws and equipped with twin rudders. (Stipulation)

24. SS Ore Chief departed Mantua Creek Anchorage on the morning of January 3, 1965, carrying 53,340 long tons of iron ore to the United States Steel Fairless Works at Morrisville, Pennsylvania. (Stipulation)

25. For the transit to Morrisville from Mantua Creek Anchorage, it was necessary for the vessel to pass through a part of the channel above the Benjamin Franklin Bridge as shown on U. S. Coast and Geodetic Survey Charts 280. (Stipulation)

26. Prior to the grounding of the Ore Chief, the U. S. Army Corps of Engineers, under date of December 17, 1964, reported and published a Channel Depth Statement which was received by Captain R. W. Rutherford, the pilot navigating the Ore Chief at the time of her grounding. This Channel Depth Statement reported the following minimum depths for the 40 foot project depth, 400 foot wide channel in the area from Ben Franklin Bridge to Cumberland Street: left channel edge 35.3 feet; left outside quarter 37.5 feet; left inside quarter 39.4 feet; right inside quarter 41.6 feet; right outside quarter 42.5 feet; right channel edge 42.1 feet. The minimum depths reported in the Channel Depth Statement for the 37 foot project depth, 600 foot channel in the area from Ben Franklin Bridge to Allegheny Avenue were as follows: left channel edge, 25.7 feet; left outside quarter, 28.5 feet; left inside quarter, 32.3 feet; right inside quarter, 33.6 feet; right outside quarter 28.5 feet; right channel edge 23.6 feet. These minimum depths are calculated to mean low water. The above-mentioned Channel Depth Statement was the last such statement reported and published by the U. S. Army Corps of Engineers prior to the grounding of the SS Ore Chief. (Stipulation)

27. As part of his local knowledge, the Ore Chief's pilot, Captain Rutherford, relied upon the channel depth statements of the Army Corps of Engineers including the latest published statement dated December 17, 1964, which contained information relating to the channel depths in river including Reach D which the Ore Chief had to transit on her way from Philadelphia to Morrisville. (Pl.Ex. 5 at 7–9; N.T. 28–29, 77–79, 94)

The master of the Ore Chief, Captain Bengston, was advised by the pilot of the latest conditions in the river, and this information supplemented that contained on the vessel's own chart which is Coast and Geodetic Survey Chart Number 280 (Pl.Ex. 34) (N.T. 28–29) The pilot's appointment by the Ore Chief was made to furnish the master with the pilot's local knowledge. (N.T. 28–29)

28. The master of the Ore Chief received the Corps of Engineers' channel depth statements from time to time. (N.T. 29) On January 3, 1965, he had either the December 17, 1964, statement (Pl.Ex. 17) (the last published one before the grounding) or the next previous one dated October 9, 1964. (Pl.Ex. 37) Neither showed the existence of 35 foot shoals or pinnacles in the 40 foot project in the area off Pier 77N. (Pl.Ex. 17 and 37; N.T. 78)

29. All Channel Depth Statements contained the caption "minimum depth in each ¼ width of channel entering from seaward" (Pl.Ex. 17 and 37) The master of the Ore Chief and the pi-

lots consider these statements as notice of the minimum depths and that there are no shallower spots than those disclosed in the Statements. (N.T. 76–77, 182, 386, 395) The master of the Ore Chief relied on the channel depth statement as being correct. (N.T. 77–79, 94)

30. Both the owner's agents, National Bulk Carriers (NBC), and Navios Corporation, the time charterer of the Ore Chief, received and relied upon the channel depth statements. (N.T. 30–32, 184)

31. Pilotage in the Delaware River is compulsory. (Stipulation)

32. At 9:00 A.M. the Delaware River pilot, Captain R. W. Rutherford, boarded the SS Ore Chief at Mantua Creek Anchorage. At this time the weather was clear, visibility good, and the wind was from the north-northwest at 15 to 25 miles per hour. At 9:18 A.M. the vessel's anchor was heaved up and she departed from Mantua Creek Anchorage. Captain Rutherford was a duly authorized and licensed pilot of the Commonwealth of Pennsylvania. (Stipulation)

33. The vessel passed under the Walt Whitman Bridge at approximately 10:55 A.M., ship's clock time. The tide gauge on the bridge-pier was observed to read one and one-quarter feet above mean low water. At approximately 11:30 A.M., ship's clock time, the Ore Chief passed under the Ben Franklin. The tide gauge on the bridge-pier was observed to read two feet above mean low water. The wind at this time was from the north-northwest at approximately 15 knots. (Stipulation)

34. Upon departure from Mantua Creek Anchorage, the SS Ore Chief had a draft of 36 feet 10 inches forward, 36 feet 10 inches aft, and 37 feet at midship (fresh water draft). (Stipulation)

35. The pilot aboard the SS Ore Chief, Captain Rutherford, is deceased and his testimony before the Coast Guard investigation is admissible in evidence. (Stipulation)

36. The bridge watch of the Ore Chief on January 3, 1965, while proceeding from Mantua Creek Anchorage to Morrisville, Pennsylvania, consisted of the pilot, master, officer of the watch, helmsman, and lookout. There was a full complement of officers and crew in the engine room. (N.T. 39, 193; Pl.Ex. 6 at 26)

37. At 11:30 A.M. on January 3 the Ore Chief, having departed from Philadelphia to proceed to Morrisville, passed under the Ben Franklin Bridge. At this time she was proceeding on slow ahead. (Pl.Ex. 3 and 4; N.T. 44, 189–90) At 11:31 A.M. her engines were put on half ahead and she proceeded accordingly until 11:39 A.M. (Pl.Ex. 4; N.T. 45, 190; Pl.Ex. 5 at 34) At 11:39 A.M. the Ore Chief was making about 6–7½ knots over the ground. (N.T. 46, 177; Pl.Ex. 19; Pl.Ex. 5 at 18)

38. At 11:39 A.M. the Ore Chief grounded. (N.T. 50) At 11:57 A.M. the Ore Chief was free of the bottom but soon fetched up on the New Jersey side. (N.T. 55)

39. At 2:37 P.M., with the assistance of five tugs, the Ore Chief was pulled away, and she proceeded upriver to Petty's Island where she was turned with the assistance of the tugs. The vessel then returned to Pier 122 South for discharging, docking there at 5:30 P.M. on January 3. (Pl.Ex. 3 and 4; N.T. 61, 195; Pl.Ex. 5 at 22). Her draft on docking after the grounding was read as 38′ 06″ forward and 36′ 6″ aft. She was deeper at the bow as a result of taking water from the grounding in the deepwater channel off Pier 77 North. (Pl.Ex. 5 at 23, 26, 27)

40. After completion of discharge at Pier 122 South, the Ore Chief went on drydock at Sun Shipyard, Chester, Pennsylvania, for survey and temporary repairs. (N.T. 66; G.Ex. 15)

41. As a result of the grounding, the Ore Chief was holed in two locations in way of the forward ballast tank on the port side. (N.T. 66; G.Ex. 15; N.T. 4–7, 4–15) The port side of the bottom extending aft had a severe indentation for about 530 feet. (G.Ex. 16(A)–(C);

N.T. 4–7, 4–15–16) The damage extended 41½ feet from the keel on the port side. (G.Ex. 17)

42. The nature of the damage to the Ore Chief was irreconcilable with the testimony of plaintiff's witnesses as to how the accident occurred. (N.T. 6–95–98)

43. The testimony of plaintiff's witnesses was that while proceeding in the 40 foot channel the Ore Chief struck unchartered and unidentified submerged objects on the river bottom. (Pl.Ex. 3 and 4; N.T. 50, 193; Pl.Ex. 5 at 41; Pl.Ex. 5(B)–(C)) At the time of this first impact, the Ore Chief was abeam of Pier 77 North on the Pennsylvania side of the river. Her portside was about 200 feet from the river end of the pier. (Pl.Ex. 3, 4 and 1, N.T. 51, 124–131, 178; Pl.Ex. 38; Pl.Ex. 5 at 15; Pl.Ex. 5(C)–(F)) The entire vessel was well within the limits of the 400 foot or deepwater channel at the time of the first impact. The impact caused the vessel immediately to lose her headway, and the engines were promptly stopped. (Pl.Ex. 3 and 4; N.T. 50, 51; Pl.Ex. 5 at 18, 19) Immediately after the first impact, both the pilot and master read the gyro compass which showed a heading of 061½°T. (N.T. 162; Pl.Ex. 5 at 12, 18, 38) The ship remained shaped up in the channel after the striking at 11:39 A.M. (N.T. 52; Pl.Ex. 5 at 20; N.T. 321, 354)

44. The testimony of plaintiff's witnesses was that as soon as the Ore Chief came in contact with the bottom at 11:39 A.M., the pilot radioed for assistance from tugs REEDY POINT and SEWELL'S POINT, which were escorting the vessel a short distance upstream to be ready at Morrisville to assist the vessel in docking there. (N.T. 53; Pl. Ex. 5 at 21; N.T. 320, 353) At the time of this radio message, the REEDY POINT was about one half mile upstream of the Ore Chief and in the vicinity of Piers 8 and 11 at Port Richmond. (N.T. 319) The master of the REEDY POINT immediately upon receiving the radio call looked aft and saw the Ore Chief still parallel to the thread of the channel and about 200–250 feet off the Pennsylvania pierhead line. (N.T. 348) The master of the REEDY POINT confirmed that the ship was in the deepwater channel and "nothing seemed to be wrong." (N.T. 320) At the same time, the SEWELL'S POINT was about several hundred feet upstream of the Ore Chief. (N.T. 353) The mate on the SEWELL'S POINT also heard the radio call and immediately observed the Ore Chief parallel to the thread of the channel, and he estimated her to be about 150 to 200 feet off the Pennsylvania pierhead line. (N.T. 353–54)

45. The testimony of plaintiff's witnesses was that within about 2 minutes of her striking bottom at 11:39 A.M., or about 11:41 A.M., the Ore Chief appeared to be free of the bottom. (N.T. 51; Pl.Ex. 5 at 41)

46. The testimony of plaintiff's witnesses was that at 11:42 A.M. the Ore Chief's engines were placed slow ahead. (Pl.Ex. 4; N.T. 52) As soon as the vessel got underway, she again struck bottom heavily and immediately she lost all headway. (Pl.Ex. 5 at 41, 45; N.T. 52) Between 11:39 A.M. and 11:43 A.M. there was no perceptible ahead movement of the vessel. (N.T. 134)

47. The testimony of plaintiff's witnesses was that the second impact at 11:43 A.M. caused the bow immediately to swing about 25–30° to port and the navigators of the Ore Chief were fearful that her bow would collide with one of the piers on the Pennsylvania side of the river. (Pl.Ex. 39; N.T. 53, 144; Pl.Ex. 5 at 41–42, 45, 4) Prompt maneuvering on the engines prevented any collision, however. (Pl.Ex. 4; N.T. 53, 170–71; Pl.Ex. 5 at 45) At 11:46 A.M. when the REEDY POINT arrived to assist, she took up a position on the Ore Chief's port bow; the bow of the Ore Chief was an estimated 200–250 feet from the piers on the Pennsylvania shore. (N.T. 322) Between 11:43 A.M. and 11:46 A.

M. the Ore Chief changed her heading and position because of rudder and engine maneuver. (Pl.Ex. 4; N.T. 52–53)

48. The testimony of plaintiff's witnesses was that at 11:46 A.M. the vessel's engines were put on full astern, and, shortly thereafter, the Ore Chief was observed to be free of the bottom. (Pl.Ex. 4; N.T. 55–56, 150, 196; Pl.Ex. 5 at 39–46) While backing, the northwest wind and floor current caught the Ore Chief on her portside moving her to starboard and forcing her starboard side against the bank of the New Jersey edge of the deepwater channel. (N.T. 55–56; Pl.Ex. 5 at 39–45; Pl.Ex. 36) Bearings were taken as follows: Pier 80–018°T, Pier 69–284°, drydock south side 323°T. (N.T. 57; Pl.Ex. 5 at 32; Pl.Ex. 34, 5 (B))

49. The testimony of plaintiff's witnesses was that these bearings establish that by 11:56 A.M. the ship was aground on the east edge of the 40 foot deepwater channel.

Moreover, the vessel had moved astern substantially and toward New Jersey between the first striking in the 40 foot deepwater channel at 11:39 A.M. and fetching up on the New Jersey bank shortly before 11:57 A.M. When the Ore Chief was already fetched up on the New Jersey side of the channel, the mate on the tug SEWELL'S POINT observed the Ore Chief about 600 feet off the Pennsylvania piers. (N.T. 357) The pilot of the Ore Chief estimated that the vessel had fetched up about 500 feet downriver of the point of the second striking at 11:43 A.M. (Pl.Ex. 5 at 45–46; Pl.Ex. 5 (D)–(F))

Meanwhile, the two tugs which had come alongside shortly after 11:46 A.M. were unable to move her away from the bank and into the channel because of the force of the northwest wind and flood current on her portside. (Pl.Ex. 3, 4; N.T. 54–56, 152, 326, 332, 355–57) The vessel was held heavily against the bank until about 2:37 P.M. when the tide reached its height. (N.T. 61, Pl.Ex. 3, 4; N.T. 329).

50. Plaintiff has made no effort to reconcile the existence of an indentation of 530 feet on the ship's port side with its witnesses' testimony that the distance traveled between the first striking and the second striking was only 70 to 90 feet and that the ship pivoted to the starboard side away from the alleged obstruction before fetching up on the New Jersey side of the river.

51. After the grounding, divers employed by plaintiff (Stith and Malley) made dives in the vicinity of Pier 77N on January 11, January 23, March 4, 5 and 20, and April 3, 12, 13 and 25, 1965. (N.T. 217–219, 244–5). A diver employed by the Corps of Engineers (Kendall) made dives on January 7 and 9 and April 8 and 13, 1965. (N.T. 7–18).

52. All divers confirmed the presence of a log rock 140 feet off Pier 77N. (N.T. 217–19; 7–27–28; 7–63). The rock was identified because it had a piling wedged in it.

53. The log rock, when located after the grounding, had a depth of 40.5 feet below mean low water; it rose about 5 feet above the river bottom and had a sunken log wedged against it. It was 12 feet long and 7 feet wide. (Stith 223–229; Pl.Ex. 9, 40).

54. Plaintiff's efforts to show that the log rock was indigenous to the river bottom were unconvincing. The futile attempts by plaintiff's divers to drive a pipe under the rock is equally probative of the existence of a heavy rock laying on a rock foundation as it is probative of indigenous rock. Furthermore, the testimony of plaintiff's geologist contradicted the divers' testimony that the rocks were indigenous. In attempting to rebut the inference raised by the government that the rocks were not indigenous because no explosives were later needed to remove the rocks, plaintiff's geologist explained that the originally indigenous rocks could have been freed from the bottom as a result of the Ore Chief's collision with it. (N.T. 4–42–43).

55. There was also a rock referred to in plaintiff's testimony as the third rock. The third rock was found slightly upstream and to the east of the log rock. It was 12 feet distant from the log rock and was about 7½ feet long and 5 feet wide. It was about 3 feet above the bottom. (Stith 218, 230; Pl.Ex. 9, 40). After the grounding, the depth of water over this rock appeared to be 42 to 43 feet below mean low water. (Stith 223; Pl.Ex. 9, 40). This rock was not a part of the river bottom and appeared to be freshly dislodged from another position. (Stith, 226; Malley 279).

56. We credit Kendall's testimony that there was no rock like the one characterized by plaintiff as the table rock. The table rock which Stith thought he had found was actually the log rock. (N.T. 7–47, 7–85). Kendall's method of surveying was thorough, and Stith's report of a table rock larger than the log rock was hastily made on April 13. (N.T. 7–39–43). Kendall's failure to report what Stith had said concerning the finding of another rock resulted from Kendall's certainty that the rock mentioned by Stith was the log rock and not a different rock. (N.T. 7–84, 85).

57. The log rock showed no signs of the abrasions one would expect from a collision with a vessel like the Ore Chief. (N.T. 7–46).

58. The Ore Chief divers brought up a piece of rock in the vicinity of the log rock. (Pl.Ex. 45; N.T. 234, 259, 283–8, 302–03). This rock sample had red paint on it like that used on ships similar to the Ore Chief. (N.T. 4–66–69).

59. We credit the testimony of the government's geologist that the red paint on the rock sample did not result from a collision with a large vessel. Close examination of the rock revealed that the crystalline structure of the rock protruded through the red paint. We are persuaded by the geologist's testimony that impact with the Ore Chief would have smashed any minute rock structure above the level of the red paint. (N.T. 8–78–79).

60. Further, the testimony of plaintiff's geologist was inconclusive on whether or not the kind of rock on which the red paint was found could, in formation, inflict the kind of damage sustained by the Ore Chief. (Compare N.T. 4–56 with 4–42).

61. The government has established that a shoal 39.5 feet deep at mean low water, like the one plaintiff claims was found in the area of the log rock after the grounding, will not touch a vessel drawing 37 feet; there would be 2.5 feet of water between the shoal and the keel of the boat. Since the tide was two feet over mean low water, there would have been 41.5 feet of water over such shoal at the time of the grounding or 4.5 feet of water under the keel of the boat when she passed over the rocks. Clearly, for the vessel to have struck a shoal at 2 feet over mean low water, the shoal could be no more than 37 feet deep at 2 feet over mean low water because the ship's draft is 37 feet.

62. Since the tide was 2 feet above mean low water at the time of the grounding, 2 feet must be subtracted from the figure of 37 feet below the surface to get the maximum depth of the rocks at mean low water. Thus, the offending rocks could be no more than 35 feet deep at mean low water to have caused the grounding.

63. Captain Halboth testified that the damage to the hull plating in the bow area was as much as 5 to 10 feet above the keel of the ship. (N.T. 9–45). For the foregoing damage to have occurred, the rocks must have been as much as 5 to 10 feet higher off the bottom than the maximum draft of the vessel. Thus, the rocks must have been at a depth no greater than 25 to 35 feet below mean low water at the time of the grounding.

64. None of the evidence presented by plaintiff supports the conclusion that a shoal with a depth of only 25 feet could have gone undetected even assuming greater care could have been exercised by the government.

65. There had been no other groundings since the inception of the 40 foot project channel pursuant to the River and Harbor Act of 1954 in the 40 foot project channel off Pier 77N prior to January 3, 1965. (N.T. 382, 385; Pl. Ex. 5, at 7–8).

66. On March 12, 1965, an abandoned floating drydock from Cramp's shipyard (Adjacent downstream of Pier 77N) broke loose from its moorings and sank. The circumstances under which the drydock parted its moorings and sank remain unexplained.

67. As soon as plaintiff's counsel learned that the drydock had sunk near or over the rocks, the Corps of Engineers were put on written notice that plaintiff had not completed its surveying of the rocks; the government was also notified that any removal of the drydock which disturbed the rocks as evidence would seriously prejudice the ORE Chief's interests. (Pl.Ex. 27, 28, 56). Witnesses for the Corps admitted receipt of the foregoing notice. (Pl.Ex. 27; N.T. 8–6).

68. Notwithstanding plaintiff's notice of the necessity for preserving the evidence to permit additional surveying of the rocks, the Corps of Engineers let a contract for the removal of the dock. The rocks were subsequently removed. There were no explosives used to remove the rocks indicating they were not indigenous to the river bottom. (G–1; G–2).

69. Plaintiff did not learn of the rock removal until May 21, 1965, when diver Stith returned, after removal of the drydock by the United States, to conduct a further examination. (N.T. 237). Plaintiff has not shown, however, that the Corps of Engineers intentionally destroyed evidence. In addition, we credit the government's testimony that the drydock was a menace to navigation. (N.T. 6–31).

70. In any case there is no evidence the removal of the rocks impeded efforts to establish the cause of the grounding since extensive dives had already taken place. Activities planned by plaintiff's divers for future dives would simply have duplicated the work already performed. (N.T. 237).

## DISCUSSION

■ The Suits in Admiralty Act, 46 U.S.C. § 742 (1970), permits suit against the United States in cases where "a proceeding in admiralty could be maintained" if a "private person or property were involved." The liability arises even though the government causes injury while engaged in a function that is considered uniquely governmental. See Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48 (1955); DeBardeleben Marine Corp. v. United States, 451 F.2d 140 (5th Cir. 1971).

The parties have argued forcefully concerning the presence or lack of a duty on the government's part with respect to surveying and issuing notices to mariners. In light of the doctrine of *Indian Towing*, we do not have to resolve the extent of this duty. *Indian Towing* held that even though the government may not have a duty in a specific area, it can still be held liable if it assumes the duty and is negligent in its performance. It is clear from the record in this case that the government has assumed the duty of surveying portions of the Delaware River. The question before us is whether or not the government breached that duty.[1]

Our resolution of that question is almost exclusively a factual one. Except for the claim that a negative inference should be drawn against the government because of the removal of the rocks, this case requires applying the preponder-

---

1. Plaintiff does not contend that the government was negligent in failing to survey periodically and for this reason missing the obstruction. Rather plaintiff has argued that the periodic surveying admittedly conducted by the government demonstrates that there exists a duty to survey. Thus the question before us is not whether or not the government's failure to survey was negligent but, rather, whether or not the surveying done was negligently done.

ance of the evidence standard to the facts before us.[2]

██ With respect to the question of the removal of the rocks, we reject plaintiff's contention. The facts do not show any intent to destroy material evidence. Because it was a hazard to navigation, there was good reason to remove the sunken drydock. In these circumstances a negative inference cannot be drawn. The situation before us is completely different from that involved in the Glasgow Maru, 102 F.2d 450 (2d Cir.) modified on other grounds, 103 F.2d 430 (2d Cir. 1939) cited to us by plaintiff. The most the plaintiff has shown is that the government was negligent in failing to prevent removal of the rocks by the independent contractor. Mere negligence resulting in destruction of evidence is not enough to require the drawing of an inference adverse to the government. See McCormack, Evidence § 273 at 660–62 (2d Ed. 1972).

If in applying the preponderance of the evidence test to the facts before us we needed only weigh the evidence, there would be little doubt that plaintiff would be entitled to judgment. The government offered very little evidence and made no attempt to show where or how the grounding occurred. Instead it questioned the quality of plaintiff's evidence.

And it is with the quality of the evidence that we also must be concerned. As stated by the commentators: "[T]he preponderance test is susceptible to the misinterpretation that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted." Dorsen & Reznik, In re Gault and the Fu-

ture of Juvenile Law, 1 Family Law Quarterly No. 4 at 26–27 (1967). See also In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). We must determine in this case whether plaintiff's evidence convinces us that it is more probable than not that the Ore Chief hit two large rocks causing extensive damage to the bow of the ship and an indentation of some 530 feet towards the aft of the ship.

The major difficulty presented by plaintiff's evidence is the irreconcilability of plaintiff's testimony and the nature of the damage to the ship. Plaintiff's witnesses testified to a first striking which halted the ship. When the ship started forward again, it incurred a second striking causing it to be impaled and swinging its bow area to the West 25° to 30°. The ship proceeded only some 70 feet before the second striking. The engines were then reversed and it drifted to the eastern edge of the channel.

The damage to the vessel occurred on its port side. There were holes in the bow some 5 to 10 feet above the keel. In addition, there was a severe indentation all along the port side for some 530 feet. None of the testimony explains how this damage could have occurred.

Plaintiff argues that the nature of the damages to the ship raises only a question of the sequence in which the damage occurred. Thus plaintiff refers us to its experts' testimony that the sequence in which the damage occurred could not be ascertained. (N.T. 6–97, 9–21–38). Our difficulty, however, is not with when a part of the ship hit an obstruction. Rather, we are concerned with how the damage could possibly have happened assuming we were to believe the testimony of plaintiff's witnesses.

2. During trial we reserved ruling on the admissibility of statements made by Pilot Rutherford at a meeting with Mr. Cable of the Corps of Engineers. The statements, as reported by Mr. Cable, concerned the location of the Ore Chief at impact and immediately afterward. We now hold such statements to be inadmissible hearsay because offered for the truth of the matter contained in them, i. e., that the ship was in a particular area at a particular time. Therefore we have not relied on these statements in making our findings of fact or conclusions of law.

These witnesses testified that the ship first hit an obstruction and halted but did not lose its headway. After coming free from the bottom, the ship started up its engines again. After proceeding no more than 75 to 90 feet, the ship again became impaled on an obstruction, and its bow swung 25° to 30° to the West. The engines were put in reverse and the ship soon fetched up on the New Jersey side of the channel despite efforts by tug boats to keep it within the 40 foot chanel.

Of course, the existence on the port side of the ship of two holes in the bow some 90 feet apart and a long indentation of some 530 feet aft of the holes in the bow suggests two strikings and a prolonged scraping of the side of the ship by some obstruction. But such an occurrence is irreconcilable with the testimony of plaintiff's own witnesses. The ship could not have scraped along the side of the obstruction if the ship swung 25 to 30 degrees to the starboard, moved astern, and fetched up on the east side of the channel.

Assuming that the accident occurred as plaintiff's witnesses testified we find it impossible to determine how the damage was sustained. For this reason we find plaintiff's version of the accident unconvincing. We reach this conclusion even though the government has failed to offer any alternative version of how the accident occurred. This result, however, is simply a recognition that the plaintiff has the burden of presenting a convincing case. There is no burden on the defendant to present convincing alternative versions of the case in order to rebut an unconvincing version presented by plaintiff.

Because of the nature of the damage to the vessel, we also find it difficult to believe that the accident occurred where plaintiff contends it did. The rocks upon which the Ore Chief is claimed to have grounded are all within the left outside quarter of the 400 feet x 40 feet channel. This quarter has an expanse of 100 feet starting 50 feet from the pier of 77N easterly to 150 feet from the pier. (See Appendix).

The most extensive damage to the vessel was sustained to port of the keel of the ship and for a distance of 41½ feet out from the centerline of the ship. For this damage to have resulted from contact with the rocks claimed by plaintiff the center of the vessel must have been on or proximate to the easterly edge of the left outside quarter for at least 41½ the pierline). Thus the ship was into and left outside quarter for at least 41½ feet. This is only 58½ feet from the left channel edge and only 108½ feet from the pier. No estimate by plaintiff's witnesses placed the vessel so close to the pier.[3]

Furthermore, if the Ore Chief did hit these rocks a substantial portion of the ship must have been in the left outside quarter of the channel where the rocks were located. The ship's location in the left outside channel was reckless in view of the December 17, 1964, channel depth statement showing a depth of only 37.5 feet in this area. The Ore Chief was drawing 37 feet. In addition, squat caused the ship to be even deeper in the channel. (N.T. 70). Squat was described by Captain Bengston as the farther distance a ship is in water as a result of the power driven engines. With a two foot tide the Ore Chief would barely have cleared the area given the squat of the ship.

Thus, the nature of the damage to the ship and the lack of prudence in being in the left outside quarter severely undermines plaintiff's evidence concerning the location of the grounding.

The evidence concerning the indigenous nature of the rocks also lacks proba-

3. In fact this estimate is most favorable to the plaintiff. A more accurate estimate would be that the port side of the ship must have been 82 feet from the pier. The log rock is 140 feet from the pier. The third rock, further east of the log rock, is not considered to have been involved in the acci-

dent. The width of the ship is 116 feet. Since the damage was to the centerline of the ship, at least one-half of the ship (58 feet) was to the west of the log rock. Thus 140 feet less 58 feet equals a distance of 82 feet that the ship was from the pier.

tive value. The plaintiff's divers' probing with pipes in an attempt to determine how far the pipe would go under the rock does not convincingly show that the rock is indigenous. The inability to probe very far could also result from having heavy rock laying on a rock bottom. Plaintiff's geologist's testimony further lessens the persuasiveness that the divers' inability to probe deeply proved the rocks were indigenous. Plaintiff's geologist attempted to rebut the inference raised by the government that the lack of use of explosives to remove the rock proved the rocks were not indigenous. The expert testified that no explosives were needed because the rocks could have been freed from the bottom by the Ore Chief collision. If the rocks were freed from the bottom, plaintiff's divers' inability to probe deeply cannot prove that the rocks were indigenous. Plaintiff has thus offered no convincing evidence that the rocks were indigenous to the river bottom.[4]

In addition, given the height of the damage on the ship and the draft of the ship, it is plaintiff's contention that the rocks which the Ore Chief hit were no more than 25 feet below the surface of the water. But the evidence of the Corps of Engineers' survey work does not exhibit such gross failure to inspect the channel. Rather there is competent evidence that the Corps was diligent and careful in its inspection of the dredging work done by the independent contractor that deepened the channel to more than 40 feet.

Plaintiff's evidence does not support its contention that the use of electronic soundings was careless. Extensive surveys were taken by the Corps by the bar sweep method. The kinds of shoals later uncovered are explained by their presence outside the 40 foot channel, and the testimony of plaintiff's own expert witness was that rocks and other matter flow down the river frequently.

We have not found convincing plaintiff's propositions concerning the existence of the rocks the Ore Chief is said to have hit and the nature of the damage to the rock samples produced by plaintiff. We credit the testimony of the government's geologist that the paint on one rock sample could not have been placed there by the kind of impact which would have resulted if the Ore Chief had hit it. Further, plaintiff could not establish convincingly that the rocks were indigenous to the river bed.

■ For these reasons we are not convinced by a preponderance of the evidence presented that the Ore Chief went aground because of the government's conduct in issuing a channel depth statement.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this suit pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741–752 (1970).

■ 2. The burden of proof is upon the plaintiff to show that its vessel grounded upon an obstruction which was at a lesser depth than that reported by the defendant by and through its United States Army Corps of Engineers in the area where the vessel is alleged to have gone aground.

3. The Court having found as a fact that no obstruction existed at a lesser depth than that reported by the United States Army Corps of Engineers for the 400 foot wide, 40 foot project depth portion of the channel in the area where its vessel is alleged to have gone aground, plaintiff has failed to carry its burden of proof, and, accordingly, judgment shall be entered for the defendant United States.

4. This opinion shall constitute our findings of fact and conclusions of law required by F.R.Civ.P. 52.

---

4. The rock brought up by plaintiff's diver Malley was claimed to have been in a crevice formed by the log rock. Even if this is so there is no evidence that this rock had been a part of the log rock. Thus the testimony of plaintiff's geologist that the log rock was indigenous, based on his observation that the piece of rock brought up was from indigenous rock, is not convincing.