**UNIVERSE TANKSHIPS, INC., as Owner of the SS ORE CHIEF, Appellant,**

v.

**UNITED STATES of America.**

No. 75–1169.

United States Court of Appeals, Third Circuit.

Sept. 11, 1975.

Decided Dec. 29, 1975.

Richard W. Palmer, Rawle & Henderson, Philadelphia, Pa. (Alfred J. Kuffler, Philadelphia, Pa., of counsel), for appellant.

Rex E. Lee, Asst. Atty. Gen., Robert E. J. Curran, U. S. Atty., Stephen F. Eilperin, Thomas L. Jones, Dept. of Justice, Washington, D. C., for appellee.

Before ALDISERT, GIBBONS and WEIS, Circuit Judges.

ALDISERT, Circuit Judge.

The owner of the Ore Chief, a bulk ore carrier that went aground in the Delaware River, sued the federal government for negligence, alleging that a channel depth statement the Corps of Engineers had published was inaccurate. The district judge found for the defendant, because he was "not convinced by a preponderance of the evidence presented that the Ore Chief went aground because of the government's conduct in issuing a channel depth statement." 388 F.Supp. 276, 288 (E.D.Pa.1974). The plaintiff has appealed. We affirm.

We have considered the six contentions raised by appellant and have concluded that the facts found in this nonjury trial were not clearly erroneous, *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir. 1972), and that the district court did not err in its legal conclusions drawn therefrom, as more particularly set forth in the opinion of Judge Daniel H. Huyett, III, *supra.*

The maritime complaint filed on December 29, 1966, and finally adjudicated December 19, 1974, alleged 11 specific acts of negligence, as well as negligence "in other respects which will be shown at trial." Plaintiff tried the case on the theory that the Ore Chief struck large indigenous rocks in the Delaware River bed; that the channel depth above the rocks was inaccurately reflected in the Corps of Engineers' published channel depth statement; and that the government was, therefore, liable in negligence for the damage from the accident. The government, for its part, made no serious attempt to offer an alternative explanation of the accident; instead it simply sought to discredit plaintiff's theory of the accident, and relied on the plaintiff's burden to prove negligence by a preponderance of the evidence.

The plaintiff was very specific in the theory under which it put the case. It argued that the Ore Chief struck particular rocks, at a particular point in the channel. It sought to establish this to show both that the government's depth statement was inaccurate, and that the inaccuracy caused the accident. Plaintiff's trial memorandum filed November 5, 1973, stated that certain "witnesses will establish the location of the rocks which caused the damage. Certain tests were performed by Ambric Testing Laboratory as to fresh paint on the rocks and a representative from the Laboratory will testify that paint on the rocks was the same as that on the bottom of the ORE CHIEF." (Trial Mem. 3.) The memorandum also stated: "The constant surveying of this area by the United States with the use of electronic sounding machines quite obviously failed to detect the rocks. Such a repeated surveying by the United States of this area constitutes constructive notice of the presence of the undetected indigenous rocks as part of the bottom, since by proper methods the United States should have known of their presence and their heights and the depth of the water over the rocks so that the depths published would be accurately reported to mariners." (Trial Mem. 13.)

In its Proposed Findings of Fact Before Trial (P.F.B.T.), the plaintiff asked the court to find the presence in the channel of three specific rocks: the "principal" or "log" rock, the "plateau" or "table" rock, and a third, unnamed rock. Plaintiff also asked the court to find that the "top surface of the log rock was newly chipped or ruptured in two separate areas," and that "[s]amples obtained from the log rock and the third

rock contained fresh paint scrapings." P.F.B.T. 13. Plaintiff sought further to support its theory that the Ore Chief collided with these rocks by proposed findings 15 and 16, which stated:

> 15. The ORE CHIEF thus came into contact at least with the log rock and the third rock. Both were uncharted obstacles within the 40′ x 400′ channel. Before it could be determined if the vessel had also came [sic] into contact with the plateau rock, the rock was destroyed . . . .
>
> 16. The weight and force of the ORE CHIEF knocked loose the upper portion of these rocks which caused the grounding.

The plaintiff did not change its theory after the close of testimony. In its Proposed Findings of Fact After Trial (P.F.A.T.) it asked the court to find that there were two indigenous rocks—log and table—plus a third rock; and that "[a]ll three of these rocks showed fresh abrasions, indicating recent contact with the bottom of the ORE CHIEF". P.F.A.T. 27. Plaintiff also asked for a finding that "[i]t was uncontradicted that [a log] rock sample had red ship's paint on its surface. . . . Ambric Testing Laboratories, Inc. analyzed the sample and concluded that the red paint on the rock was the same paint as applied to the bottom of the ORE CHIEF on the occasion of her last drydocking in July, 1964 prior to the grounding." P.F.A.T. 28. Additional suggested findings related to the size and location of all three rocks, P.F.A.T. 27; the obtaining of the log rock sample, P.F.A.T. 29; and the indigenous nature of the log and the ta-

ble rocks, P.F.A.T. 27 & 31. After thus requesting numerous specific findings describing these three rocks in detail, plaintiff requested a finding that:

> The uncontradicted preponderance of credible evidence established that the weight and force of the ORE CHIEF collided with and fragmented the upper portion of these indigenous rocks which caused the grounding.

P.F.A.T. 35.

■ In its reply brief on appeal plaintiff advances an argument in the nature of res ipsa loquitur quite at variance with its trial strategy. Plaintiff asserts that the "most persuasive argument" for reversal "is based on certain of the Court's findings which were fully supported by the record: (1) the vessel grounded in the channel and (2) the vessel sustained the alleged damage on that occasion." Reply Brief at 1. We do not decide whether there were such "findings",[1] or whether they were "fully supported by the record," because, whatever merit such a theory might have had at trial, it has none now.

■ Federal procedure relies on notice pleading rather than fact pleading, but at a minimum, as explained by the Advisory Committee on Civil Rules in October, 1955, the pleader is required "to disclose adequate information as the basis of his claim for relief". 2A J. Moore, *Federal Practice* ¶ 8.01[3] (2d ed. 1974). *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), teaches that "the defendant [be given] fair notice of what the plaintiff's claim is and

---

1. Plaintiff asserts that the trial court "found definitively that the ORE CHIEF had grounded *within* the 40 foot project channel," citing Finding 43. Reply Brief at 2. This misreads that finding. Finding 43 merely sets forth testimony of plaintiff's witnesses about the accident; it does not adopt the testimony as the court's finding.

   In its reliance on Findings 43 and 46, the dissent has fetched up on the same shoals. Findings 43 through 49 all begin as follows: "The testimony of plaintiff's witnesses was that . . . ." Finding 42 states that "[t]he nature of the damage to the Ore Chief was irreconcilable with the testimony of plaintiff's witnesses as to how the accident occurred." When a trial court sitting as a fact finder has refused to find a fact, no appellate court, nor judge thereof, can elevate to "fact" that which the fact finder refused to find. The device of setting plaintiff's contentions in quotation marks and italics, while evidencing enthusiasm, (see dissent pages 78, 79), lacks jurisprudential potency to convert a non-fact into a fact-found.

*the grounds upon which it rests,"* (emphasis supplied), and we have recently reiterated that the defendant is entitled to "fair notice of the claim asserted." *Joiner Systems, Inc. v. AVM Corp.,* 517 F.2d 45, 47 (3d Cir. 1975). Rule 15 of the Federal Rules of Civil Procedure fits the pattern, allowing liberal amendment of pleadings to conform to issues actually tried by express or implied consent of the parties. However, a different theory of recovery may not be urged on appeal where prejudice would result to the other party.[2] The test for prejudice in this context is whether the other party "had a fair opportunity to defend and whether it could offer any additional evidence on the different theory." *Jurinko v. Edwin L. Wiegand Co.,* 477 F.2d 1038, 1045 (3d Cir.), *vacated on other grounds,* 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973); 3 J. Moore, Federal Practice ¶ 15.13[2], at 993 (2d ed. 1974); *see United States v. 47 Bottles, More or Less,* 320 F.2d 564, 573 (3d Cir.), *cert. denied,* 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963).[3]

■ We feel that consideration of plaintiff's argument in the nature of res ipsa loquitur would be prejudicial to the government. At the very least, if the government had been aware of this theory at trial it might have been more contentious about the facts of the accident. The government stipulated to several facts, including the Ore Chief's draft, and the condition of the tide, and, as indicated, relied primarily on the plaintiff's burden of proving the government negligent rather than offering its own version of the accident. Accordingly, we decline the invitation to reverse the district court on the theory in the nature of res ipsa loquitur, which was not raised in the district court. *See TMA Fund, Inc. v. Biever,* 520 F.2d 639, 641 (3d Cir. 1975); *United States v. Greenlee,* 517 F.2d 899, 905 (3d Cir.), *cert. denied,* —— U.S. ——, 96 S.Ct. 391, 46 L.Ed.2d 301 (1975); *Rhoads v. Ford Motor Co.,* 514 F.2d 931, 933–34 (3d Cir. 1975).[4]

In its role as a fact finder the court summarized the duty before it:

> It is clear from the record in this case that the government has assumed the duty of surveying portions of the Delaware River. The question before us is whether or not the government breached that duty.
>
> Our resolution of that question is almost exclusively a factual one. Except for the claim that a negative inference should be drawn against the government because of the removal of the rocks, this case requires applying the preponderance of the evidence standard to the facts before us.

388 F.Supp. at 285–86 (footnotes omitted). The court performed its duty, ar-

---

**2.** Recently, the Supreme Court had occasion to comment on the propriety of entertaining a point not raised in a petition for certiorari or a cross-petition. "Because it would alter the judgment of the Court of Appeals, which like that of the District Court had effectively put an end to the litigation, rather than providing an alternative ground for affirming it, we will not consider the argument when raised in this manner." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61–62 n. 11, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975).

**3.** We recognize that, in *Jurinko,* we considered the different theory on appeal. There, however, we found no prejudice to the defendant. Moreover, the theory was advanced to affirm the judgment of the district court, rather than to reverse it. *Jurinko, supra,* 477 F.2d at 1045. *Compare* n. 2 *supra.*

**4.** Apparently disagreeing with the Supreme Court's decision in *Conley v. Gibson, supra,* the dissent does not choose to meet the issue jurisprudentially or prudentially; instead it makes accusations of "gamesmanship" and, from a jural quarterdeck, observes that res ipsa loquitur "was in the case all along". Although this theory was not invoked by the plaintiff's attorneys at trial and escaped detection by the district judge, the dissent would discover it in the factual allegations and consider it on appeal. This was not *pro se* litigation. Plaintiff's lawyers had this case in the district court for eight years—from December 29, 1966, to December 19, 1974. The dissent faults us for expecting too much—for expecting that some time during those eight years plaintiff's counsel would have shared with the trial court and the defendant a theory they disclosed for the first time in a reply brief on appeal.

ticulating clearly both its fact finding and its legal conclusion:

> We have not found convincing the plaintiff's propositions concerning the existence of the rocks the Ore Chief is said to have hit and the nature of the damage to the rock samples produced by plaintiff. We credit the testimony of the government's geologist that the paint on one rock sample could not have been placed there by the kind of impact which would have resulted if the Ore Chief had hit it. Further, plaintiff could not establish convincingly that the rocks were indigenous to the river bed.

*Ibid.* at 288.

> While we consider the evidence supporting plaintiff's theory of the case to be substantial, we have concluded, after a careful consideration of the nature and quality of plaintiff's evidence, that plaintiff has failed to prove it more probable than not that the Ore Chief went aground in a collision with rocks the water above which had a depth less than that reported by the government in its notices to mariners. We will, therefore, enter judgment in favor of the government.

*Ibid.* at 277–78.

■ Upon an independent examination of the record, we do not consider the court's fact finding clearly erroneous. These facts being vital to the theory under which plaintiff tried its case, there was no error in the trial court's conclusion.

The judgment of the district court will be affirmed.

GIBBONS, Circuit Judge (dissenting).

I cannot vote to affirm because there is a plain theory of recovery advanced by the pleadings, never abandoned, supported by the evidence, but entirely neglected in the district court's findings. The majority, unable to deal with this theory of recovery on the merits because the district court failed to do so, selectively edits the record to conclude that the theory was never in the case. The Federal Rules of Civil Procedure were intended to eliminate gamesmanship theories of pleading. What the majority has done is to restore the gamesmanship that I thought our system of law had outgrown.

This case commenced with the filing of a maritime complaint against the United States charging that it negligently published and distributed to mariners an inaccurate notice and an inaccurate chart showing minimum depth as 37.5 feet at mean low water in a 400 foot wide channel in the Delaware River in the vicinity of Pier 77 North, Philadelphia. The complaint alleged that the vessel, with a draft of 37 feet grounded in that channel at a time when the tide was 2 feet above mean low water, and "that the vessel's bow or front end was impaled on an uncharted, unknown, submerged obstruction in the 400 foot channel." (Complaint ¶ 6).

The government's factual theory was stated in its pretrial memorandum filed December 10, 1968:

> The channel limits of 37.5 feet were exceeded by having a vessel which was drawing 37 feet without allowing for sinkage and squat and for the roughness in the natural bottom of the river.

The government contended, in other words, that the vessel's draft exceeded the charted depth.

Pursuant to a pretrial order the parties entered into a stipulation of uncontested facts. That *stipulation* established that upon departure from its anchorage at Mantua Creek the vessel had "a draft of 36 feet 10 inches forward, 36 feet 10 inches aft and 37 feet at mid-ship (fresh water draft)." (Stipulation, ¶ 9; 49a). The *stipulation* also established that when the vessel passed under the Walt Whitman Bridge at approximately 10:55 a. m. the tide gauge on the bridge-pier was observed to read one and one-quarter feet above mean low water, and that when the vessel passed under the Ben Franklin bridge at 11:30 a. m. the tide gauge read two feet above mean low water. (Stipulation, ¶ 8; 49a).

The court found that the grounding occurred at 11:39 a. m. Finding of Fact 39, 388 F.Supp. at 281. Thus the *stipulation* established that at the time of the grounding the tide was flooding and that there should have been *at least* two feet more water in the channel than the depths shown on the published depth statements. The *stipulation* also established that the pilot navigating the vessel at the time of the grounding had a channel depth statement which "reported the following minimum depths for the 40 foot project depth, 400 foot wide channel in the area from Ben Franklin Bridge to Cumberland Street: left channel edge 35.3 feet; left outside quarter 37.5 feet; left inside quarter 39.4 feet; right inside quarter 41.6 feet; right outside quarter 42.5 feet; right channel edge 42.1 feet. . . ." These minimum depths are calculated to mean low water. (Stipulation, ¶ 5; 48a).

Thus the *stipulation* established that in the 400 foot wide channel above the Ben Franklin Bridge at the time of the grounding there should have been at least these minimum depths: left channel edge 37.3 feet; left outside quarter 39.5 feet; left inside quarter 41.4 feet; right inside quarter 43.6 feet; right outside quarter 44.5 feet; right channel edge 44.1 feet. The court found as a fact:

> The entire vessel was well within the limits of the 400 foot or deepwater channel at the time of the first impact. *The impact caused the vessel immediately to lose her headway,* and the engines were promptly stopped. . . . The ship remained shaped up in the channel after the striking at 11:39 A.M.

> .    .    .    .    .

> As soon as the vessel got underway [about 11:41 A.M.] she again struck bottom heavily *and she immediately lost all headway.*

Findings of Fact 43, 46, 388 F.Supp. at 282 (emphasis supplied).

The court found that the vessel was well within the limits of the 400 foot channel at the time of the grounding for the simple reason that there is no evidence whatsoever placing her elsewhere. What little dispute there is in the testimony about the vessel's location tends to suggest that she was nearer to the center of the 400 foot channel than to the left outside quarter. No evidence places her on the left channel edge.

Therefore it is undisputed that a vessel with a *stipulated* draft of 37 feet grounded in a channel in which by the *stipulated* facts at the time of the grounding there should have been at least 2.5 feet of water under the hull. The stipulated facts and the court's finding as to the vessel's location at the time of the grounding establish that it hit *something* on the river bottom which extended at least 2.5 feet above the depth charted by the government and relied upon by the pilot.[1]

It is of course conceivable that the *something* which the vessel certainly hit in the 400 foot channel was an object which came to rest there after the surveys on which the government relied in preparing its channel depth statement were made. Thus the location of the grounding and the stipulated facts are not alone sufficient to establish negligence in surveying for the published depth statement. But there are two other facts found by the court which, when added to other uncontradicted and unimpeached evidence to which the court makes no reference, establish a prima facie case of negligent surveying.

The court found that at the time of the grounding the vessel was proceeding at slow ahead, making 6–7.5 knots over the ground. The 20,910 ton vessel was carrying 53,340 long tons of iron ore. Findings of Fact 23, 24, 37, 388 F.Supp. at 280–81. The court found that when she grounded *"the impact caused the vessel immediately to lose her headway."* Thus an object weighing in excess of

---

1. The court found as a fact that "[t]he master of the Ore Chief relied on the channel depth statement as being correct." Finding of Fact 29, 388 F.Supp. at 281.

74,250 tons, moving over the ground at between 6–7.5 knots, was stopped instantly by whatever it hit. If what it hit was an indigenous rock ledge extending two feet higher in the channel than the charts show, the libelant has made out a prima facie case. There is almost nothing that I can imagine *lying loose on the bottom* that could have absorbed enough energy to stop the vessel's headway in the manner found by the court.

At this point I must turn to testimony to which the court makes no reference. Murphy, an expert witness for the vessel owner, testified that only indigenous rock could have stopped suddenly so heavily laden a ship steaming at 6–7.5 knots. The court did not *reject* this testimony, but simply ignored it. It is nowhere contradicted and it seems, at least to me, entirely reasonable. Of course the district court could have rejected Murphy's expert opinion on credibility grounds, but it did not do so.

It seems to me that by overlooking the testimony that *only* indigenous rock could have caused the physical phenomenon which it found to have occurred, the court arbitrarily refused to consider a separate theory of liability.

It is true that the vessel owner attempted to identify specific indigenous rocks as the cause of the grounding, and failed to convince the trier of facts. But that effort did not indicate any abandonment of the pleaded theory that the vessel grounded on an "uncharted, unknown, submerged obstruction in the 400 foot channel." It may be that the object which was struck shattered in absorbing the enormous energy of the impact, and cannot be identified. But Murphy's testimony makes out a prima facie case that the object was indigenous rock in a place where there should have been none.[2] Since I cannot pass on Murphy's credibility I would remand for further findings on this theory of liability. The theory certainly was tried. *See* Rule 15(b) Fed.R.Civ.P.

2. I do not share the majority's view that appellant committed itself to the three-rock theory at trial and thus should be barred from raising res ipsa loquitur on appeal. The complaint makes no reference to a collision with any specific rocks. Nor does a pretrial memorandum filed by appellant in late 1968. In a 1973 memorandum entitled "Libellant's Proposed Findings of Fact Before Trial", appellant contends that the Ore Chief struck "at least" two of the rocks specifically identified at trial. ¶ 15. I do not believe that appellant thereby intended to foresake the opportunity to present evidence and to argue that the collision occurred with some other unidentified object. Indeed, I believe that this is the thrust of Murphy's testimony. The uncontradicted testimony of this expert was to the effect that indigenous rock *in general* collided with the Ore Chief, not that the three specific rocks were indigenous. In fact, Murphy never refers in his testimony to those particular rocks.

The majority says that the appellant is foreclosed from raising res ipsa on appeal because of the "prejudice" the government would suffer. Since I believe the issue was in the case all along, I disagree. It is also worth noting that nowhere has the government protested as unfair our consideration of this issue on appeal. I therefore believe that the majority was unwarranted in making such a finding sua sponte.