George S. **KRASNOV** et al., Appellants,

v.

Brendan **DINAN**.

No. 72–1337.

United States Court of Appeals,
Third Circuit.

Argued July 11, 1972.

Decided Sept. 7, 1972.

Donald J. Farage, Farage & Shrager, Philadelphia, Pa., for appellants.

John R. McConnell, Morgan, Lewis & Bockius, Philadelphia, Pa., (Thomas C. Sadler, Jr., Philadelphia, Pa., on the brief), for appellee.

Before ALDISERT, MAX ROSENN, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal requires us to decide whether plaintiffs sustained the burden of proving diversity of citizenship of the parties in order to confer federal jurisdiction. Specific to our inquiry is a review of the district court's finding that because defendant intended to remain at his Pennsylvania residence indefinitely, he must be considered a citizen of that state, 333 F.Supp. 751, 339 F.Supp. 1357.

After the jurisdictional allegation was traversed, the district court considered evidence produced both by depositions, Tanzymore v. Bethlehem Steel Corp., 457 F.2d 1320 (3d Cir. 1972), and at an evidentiary hearing, and concluded that defendant, a member of a religious order, was a citizen of Pennsylvania. Because plaintiffs were also citizens of that state, and because federal jurisdiction was alleged solely on diversity, 28 U.S.C. § 1332, judgment was entered in favor of the defendant.

■ The factual complex presented to the district court was unusual, but the controlling legal principles are well settled. Historical or chronological data which underline a court's determination of diversity jurisdiction are factual in nature, McSparran v. Weist, 402 F.2d 867 (3d Cir. 1968), cert. den. sub nom., Fritzinger v. Weist, 395 U.S. 903, 89 S. Ct. 1739, 23 L.Ed.2d 217 (1969), and, on review, are subject to the clearly erro-

neous rule. F.R.Civ.P. Rule 52(a), 28 U.S.C.; Hoffman v. Lenyo, 433 F.2d 657 (3d Cir. 1970); Joyce v. Seigel, 429 F. 2d 128 (3d Cir. 1970); 9 Wright & Miller, Federal Practice and Procedure: Civil § 2589, at 759 (1971). See also Walden v. Broce Constr. Co., 357 F.2d 242 (10th Cir. 1966).

▇▇▇ Where the ultimate conclusion is a determination of a party's citizenship, the requisite intention to establish domicile, and therefore citizenship, is a factual finding. Gallagher v. Philadelphia Transp. Co., 185 F.2d 543 (3d Cir. 1950). To find this intention, the court must find "an actual, not pretended, change of domicile; in other words, the removal must be 'a real one, *animo manendi,* and not merely ostensible.' Case v. Clarke, 5 Mason, 70. The intention and the act must concur in order to effect such a change of domicile as constitutes a change of citizenship." Morris v. Gilmer, 129 U.S. 315, 328, 9 S.Ct. 289, 293, 32 L.Ed. 690 (1889). Professor Wright has neatly synthesized the doctrine: "A citizen of the United States can change his domicile instantly. To do so, two elements are necessary. He must take up residence at the new domicile, and he must intend to remain there. Neither the physical presence nor the intention to remain is alone sufficient."

Wright, Federal Courts § 26, at 86 (2d ed. 1970).[1] *Cf.,* the lesser degree of proof required to establish status of "resident." Government of the Virgin Islands ex rel. Bodin v. Brathwaite, 459 F.2d 543 (3d Cir. 1972). It is the citizenship of the parties at the time the action is commenced which is controlling. Brough v. Strathmann Supply Co., 358 F.2d 374 (3d Cir. 1966). One domiciled in a state when a suit is begun is "a citizen of that state within the meaning of the Constitution, art. 3, § 2, and the Judicial Code . . . (Gassies v. Ballon, 6 Pet. 761, 8 L.Ed. 573; Boyd v. Nebraska, 143 U.S. 135, 161, 36 L.Ed. 103, 109, 12 S.Ct.Rp. 375; Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627.) . . . ." Williamson v. Osenton, 232 U.S. 619, 624, 34 S.Ct. 442, 58 L.Ed. 758 (1914); Pemberton v. Colonna, 290 F.2d 220 (3d Cir. 1961). Where one lives is prima facie evidence of domicile, District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329 (1941), but mere residency in a state is insufficient for purposes of diversity. Sun Printing and Publishing Ass'n v. Edwards, 194 U.S. 377, 24 S.Ct. 696, 48 L. Ed. 1027 (1904). The fact of residency must be coupled with a finding of intent to remain indefinitely. Proof of intent to remain permanently is not the test. "If the new state is to be one's home for

---

1. The commentators appear to have some difficulty as to whether the concept of domicile for federal diversity purposes should be equated with conflict of laws definitions or be recognized as a *sui generis* principle. Compare Hart and Wechsler: "From the beginning the Court has steadily insisted that state citizenship for the purposes of diversity jurisdiction, is dependent upon two elements: first, United States citizenship; and second, domicile in the state, in the traditional sense of the conflict of laws. See *e. g.,* Brown v. Keene, 8 Pet. 112 (U.S.1834), 8 L.Ed. 885." Hart & Wechsler, The Federal Courts and The Federal System 898 (1953); with Professor Wright: "A person's domicile is that place where he has his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom. . . . The definition of domicile in Restatement, Con-

flict of Laws, 1934, § 9, is rather vaguer than that set forth in the text. One difficulty with this subject is the tendency to use cases and texts dealing with 'domicile' in the law of *conflicts as applicable to* 'domicile' for the purposes of federal jurisdiction. The problem of what law to apply is surely a different problem from that of whether a litigant should have access to federal court, and it does not conduce to clarity of analysis to suppose that the same answers will suffice for different questions. See Ziady v. Curley, C.A.4th, 1968, 396 F.2d 873, 876." Wright, Federal Courts § 26, at 86 and n. 4 (2d ed. 1970). A resolution of this philosophical difference is not necessary in the circumstances presented by this appeal. We are inclined to agree with the Wright approach because the legal conclusion of domicile in diversity cases is at best a substitute for the constitutional requirement of state citizenship.

an indefinite period of time, he has acquired a new domicile." Gallagher v. Philadelphia Transp. Co., *supra,* 185 F. 2d at 546. Where jurisdictional allegations are traversed, as here, "[t]he burden of showing . . . that the federal court has jurisdiction rests upon the complainants." Gibbs v. Buck, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939); Tanzymore v. Bethlehem Steel Corp., *supra*; Nelson v. Keefer, 451 F.2d 289 (3d Cir. 1971). "In determining whether a party has intended to establish a domicile in the state to which he has moved, the factfinder will look to such circumstances as his declarations, exercise of political rights, payment of personal taxes, house of residence, and place of business." Wright Federal Courts § 26, at 87 (2d ed. 1970); Mitchell v. United States, 88 U.S. (21 Wall.) 350, 353, 22 L.Ed. 584 (1874).

Therefore, having averred that Brendan Dinan was a "citizen and domiciliary of the State of Connecticut and/or New York," plaintiffs were obliged to support the allegation of proof once the defendant filed an answer alleging that Dinan was a "citizen and domiciliary of the Commonwealth of Pennsylvania."

Against the backdrop of these principles, we turn to the evidence adduced by deposition and testimony before the district court. Crucial to these proceedings was the determination of citizenship of Dinan on March 27, 1971, the date the complaint was filed. Dinan described himself as a religious brother, a member of a Roman Catholic semi-monastic teaching order. He took religious vows in 1961 including one to go wherever the Superior General of his Order wished to send him. At various times he was transferred to Indiana, Texas, and New York. In January, 1962, he was transferred to Connecticut where he remained until he went to Bethelem, Pennsylvania, in August, 1968, to take up teaching duties at Bethlehem Catholic High School. Consistent with vows, Dinan owned no property other than clothing contained in a foot locker which accompanied him to Pennsylvania.

When he went to Connecticut, he possessed a Rhode Island driver's license, which he retained and renewed. In addition, he obtained and renewed one from Connecticut, even while residing in Pennsylvania. At no time did he apply for a Pennsylvania license. On application for renewal of his Connecticut license on December 12, 1968, he listed Bethlehem, Pennsylvania, as his residence. While residing in Pennsylvania, Dinan voted in Connecticut elections by absentee ballot.

When asked for his "official residence" at his first deposition, he responded: "We use New Haven, Connecticut, which is the provincial administration or central office. . . . That is where I vote. It is our central headquarters, because we are moving around somewhat frequently, and you never know how long."

When a second deposition was taken, Dinan was no longer a resident of Pennsylvania, but was teaching in Brooklyn, New York. He stated that at the time he was stationed there he intended to make Brooklyn his home. When asked why, he replied: "Well, it was my home. I worked there. This is our thinking and you are part of the community, the congregation is. When you go to an area—when you are assigned to an area, this is your home and you become a native." He testified also that when he was in Connecticut he intended to make that state his home for the same reason. Asked how long he intended to make it his home, he responded: "Forever, I mean, as long as you have no order. I can't say that I would be there a month or fifty years. This is my home."

Finally, he was asked about Pennsylvania:

"Q. At the time you were assigned to Bethlehem Catholic High School was there any stipulated term? Were you told how long you would be there?

"A. No.

"Q. And where did you intend to make your home upon assignment to Pennsylvania?

"A. Bethlehem.

"Q. Now at the time you were assigned to and living in Pennsylvania did you have any intention of leaving Pennsylvania at any time and going back to live with your mother? .

"A. Absolutely not."

On balance, it becomes apparent that the factors bearing on the issue of Dinan's domicile most favorable to plaintiffs' theory were: (1) Dinan's statement at the first deposition that his "official residence" was Connecticut; (2) his continuing to vote in Connecticut by absentee ballot while living in Pennsylvania and (3) his continuing to use a Connecticut driver's license and a failure to apply for one in Pennsylvania.

Plaintiffs vigorously present the argument that Dinan has but one domicile, in a state outside of Pennsylvania, probably in Connecticut, the self-styled "official residence" of the religious order, and that any teaching assignment elsewhere was similar to a compelled physical presence elsewhere, much the same as the transfer of soldiers whose movements are the result of military orders and not free choice. He would have us invoke the military servicemen principle enunciated in Turek v. Lane, 317 F. Supp. 349, 350 (E.D.Pa.1970): "The domicile of a serviceman at the time of enlistment is presumed not to change, and evidence of an intention to change must be 'clear and unequivocal.'" Underlying this concept is a recognition that the selection of a residence of a person subject to military orders is not a voluntary choice, but the product of compulsion. The most persuasive indication of the compulsory nature of Dinan's transfer orders was evidence that he took vows of obedience to the Superior General of his Order. Arrayed against this, however, was Dinan's testimony that these "vows of obedience" were "theoret-

ically" correct, but in practice a member of his Order did not have to go where assigned. He related one specific incident where he refused a position and location offered him.

Dinan attributed his failure to obtain a Pennsylvania driver's license to financial reasons and to his unwillingness to obtain the medical certificate required in that state. Although the place where one votes has an important consideration, many trial courts have found domicile, and therefore an intention to remain indefinitely, in a place other than where the party voted. Thus, in Ferrara v. Ibach, 285 F.Supp. 1017 (D.S.C. 1968), domicile was found in South Carolina although the domiciliary was registered to vote in Pennsylvania; in Chaney v. Wilson-Benner, Inc., 165 F.Supp. 64 (M.D.Pa.1958), the residence was found to be in Pennsylvania, although the party was registered to vote in Ohio; in Messick v. Southern Pennsylvania Bus Co., 59 F.Supp. 799 (E.D.Pa. 1945), the court found a Delaware domicile although plaintiff had voted twice in Pennsylvania.

 "In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are 'left with a definite and firm conviction that a mistake has been committed.'" Speyer, Inc. v. Humble Oil and Refining Co., 403 F.2d 766, 770 (3d Cir. 1968). It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court. To

hold otherwise would be to permit a substitution by the reviewing court of its finding for that of the trial court, and there is no existing authority for this in the federal judicial system, either by American common law tradition or by rule and statute.

Applying these principles to the evidence before the fact-finder, we cannot construe, as clearly erroneous, its finding that the defendant "intended to remain in the Commonwealth for an indefinite period of time." Because *animo manendi* is at best a subjective manifestation, Dinan's own declarations of intent are important, as were his explanations of the lack of compulsion in religious order assignments and his failure to obtain a Pennsylvania driver's license. On balance, plaintiffs were left with the significant factor of Dinan's continuing to vote in Connecticut. Although this is an important indication of intention, it is not necessary controlling, and was merely one of several indicia properly considered by the court.[2]

The judgment of the district court will be affirmed.

2. Regretfully, one additional comment must be forthcoming. Appellant has assigned as additional ground for reversal the contention that "the Court's conduct was hostile throughout the hearing, and that he was guilty of abuse and unjudicial action in his remarks concerning plaintiffs' counsel," and that "every semblance of Due Process was denied in this hearing."

At one time the court told counsel: "You can dissent until you drop dead. I'm sick and tired of hearing it. Go ahead."

This colloquy between the court and plaintiffs' counsel, and other colloquies containing remarks of a personal nature from the court to counsel, apparently stemmed from disputes over procedure: whether the requested evidentiary hearing was *de novo* or designed merely to supplement matters adduced by deposition. Additionally, there was a question whether jurisdiction remained in the district court or whether the proceedings were already in this court on appeal.

Although we have carefully considered appellants' argument and conclude that no reversible error was committed, this is not to indicate that we approve any injudicious remarks of the trial judge. Trial tactics of energetic counsel may, at times, make it extremely difficult for a court to maintain a calm and dispassionate demeanor. But we find nothing in the record of this case which reveals any deviation by counsel from the proper parameters of advocacy and absolutely nothing warranting the personal comments addressed to him by the trial judge. Although a judge must not be exposed to "undignified and discourteous conduct" by trial counsel, DR 7–106(c)(6), Disciplinary Rules, American Bar Association, the court must always be "patient, dignified and courteous toward litigants, jurors, witnesses, lawyers, and others who appear before him. . . ." Proposed Canon 2, Canons of Judicial Ethics, ABA special committee on Standards of Judicial Conduct.