**UNITED STATES of America, Appellant,**

v.

**KELLY, Michael, Appellee in No. 82–1539**

**and**

**UNITED STATES of America, Appellant**

v.

**KELLY, Stephen, Appellee in No. 82–1541.**

**Nos. 82–1539, 82–1541.**

United States Court of Appeals, Third Circuit.

Argued Feb. 18, 1983.

Decided May 31, 1983.

Rehearing and Rehearing En Banc Denied June 24, 1983.

Certiorari Denied Oct. 17, 1983. See 104 S.Ct. 279.

Gibbons, Circuit Judge, dissented and filed opinion.

Frank Sherman (argued), Asst. U.S. Atty., Peter F. Vaira, U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Philadelphia, Pa., for appellant.

Steven Morley (argued), Asst. Defender, Defender Ass'n of Philadelphia, Federal Court Div., Philadelphia, Pa., for Michael Kelly.

Mary McNeill Zell (argued), Barry H. Denker, Philadelphia, Pa., for Stephen Kelly.

Before GIBBONS, HUNTER and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

The United States appeals from two pretrial orders entered by the United States District Court for the Eastern District of Pennsylvania suppressing evidence in the federal criminal prosecutions of Stephen Kelly and Michael Kelly. The government had planned to introduce three tape-recorded phone conversations between the Kellys and Edward Bencsik involving an alleged deal to buy phenyl-2-propanone. The district court suppressed the tape recordings and their transcripts because it found that Bencsik had not voluntarily consented to the monitoring of the phone conversations. We will reverse.

### I

#### Facts

In January of 1982, Edward Bencsik was living in Bensalem Township, Pennsylvania at the apartment of a friend, Charles Clarkson. The government contends that on the evening of January 1, 1982, Stephen and Michael Kelly went to Bencsik's apartment and forced Bencsik at gunpoint to turn over the car keys to a 1969 Plymouth GTX which was parked in his driveway.[1] The Kellys allegedly took the car as security for $2000 that Michael Kelly had advanced Bencsik in a drug deal. The next evening Bencsik told Clarkson that the car had been taken by the Kellys as collateral for the $2000. Clarkson, concerned over the disappearance of the car, insisted on telephoning the police to report that it had been stolen. A Bensalem Township police officer arrived at Clarkson's apartment and, while Bencsik waited outside, Clarkson presented to the investigating officer an outline of Bencsik's dealings with the Kellys in hypothetical terms. After the officer left, Clarkson brought Bencsik back into the apartment and suggested to him that he should cooperate with the police.

A short time later the officer returned, accompanied by Bensalem Township Police Chief Richard Viola. Viola discussed with Bencsik his actual dealings with the Kellys and asked him if he would be willing to phone the Kellys to verify what had happened. Bencsik agreed. During that discussion Clarkson brought up that Bencsik had a pending criminal charge in Bucks County, Pennsylvania, and asked Viola if he could assist Bencsik in resolving it. Viola was non-committal but said that he would look into the matter.

That same evening Viola contacted DEA Special Agent Richard Compton who Viola knew was involved in an active investigation of Stephen Kelly. Viola and Compton agreed to meet with Bencsik at Viola's apartment to record Bencsik's phone call. When Compton arrived he spoke with Bencsik about the investigation and told him that he wanted to record a conversation between Bencsik and either Stephen or Michael Kelly. Compton suggested certain topics that Bencsik could mention in the phone call but did not specify what Bencsik should say. He also explained that he needed Bencsik's consent to tape-record the call.

1. The Plymouth GTX had been sold to Bencsik by Clarkson's girlfriend. At the time the Kellys allegedly seized the car, Bencsik owed Clarkson's girlfriend a substantial balance on the car, and title was still in her name.

Bencsik agreed to the recording and the monitoring of the call. Compton dialed the Kellys' number, and Bencsik spoke with Stephen Kelly for several minutes. Compton listened to and recorded that conversation.

On the morning of January 4, 1982, Bencsik went to the Bensalem Township Police Department and was fitted with a body recorder. Shortly after noon he returned to Clarkson's apartment where he met with Clarkson, Compton, and Viola. Compton asked Bencsik if he could monitor another call between Bencsik and the Kellys. Bencsik agreed. Bencsik called the Kellys, and Compton recorded a conversation between Bencsik and Michael Kelly. Later that afternoon Compton asked Bencsik to make another call. Bencsik again agreed, and Compton recorded a second conversation between Bencsik and Michael Kelly. Both Kellys were arrested later that day.[2]

Bencsik testified that between January 2 and January 4 he probably used either marijuana or methamphetamine. Although he could not remember exactly what drugs he might have taken, Bencsik described himself as a fairly regular user of methamphetamine, Demerols, and marijuana during that time period. Bencsik stated, however, that the drugs did not impair his ability to reason and think and that his usage was "[n]ot to an extent [that] I wasn't in touch with reality." App. at 176A–77A.

On the evening of January 6, Bencsik again met with Clarkson, Compton, and Viola. The subject of Bencsik's possible relocation to ensure his personal safety came up as well as Clarkson's concern over being paid for the car. The following day Compton gave Bencsik $1000 in cash from DEA funds. Bencsik paid Clarkson $700 to cover the balance owed on the car and kept the remainder for relocation expenses. At no time prior to the making of the tape-recorded conversations did either Compton or Viola express or imply to Bencsik that he would be paid any money for giving his consent to the recordings.

### Proceedings Below

On February 8, 1982, a federal grand jury indicted Stephen and Michael Kelly for their alleged involvement in an unlawful plan to manufacture and sell drugs. Stephen Kelly was charged with conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (1976), with using a firearm to commit a felony in violation of 18 U.S.C. § 924(c)(1) (1976), and with knowingly and intentionally using a telephone in facilitating the commission of a felony in violation of 21 U.S.C. § 843(b) (1976). Michael Kelly was charged with conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (1976), and with two counts of knowingly and intentionally using a telephone in facilitating the commission of a felony in violation of 21 U.S.C. § 843(b) (1976).

Prior to trial the defendants moved for a hearing to determine the admissibility of the three recorded phone conversations. *See United States v. Starks,* 515 F.2d 112 (3d Cir.1975). On July 6, 1982, the district court held an evidentiary hearing on defendants' motion. After listening to testimony from Compton and Bencsik, the district court tentatively ruled that the tapes were admissible. It based its ruling upon a determination that the tapes were audible, that a proper chain of custody had been established, and that Bencsik had consented to the recording of the conversations by Compton. Because Michael Kelly's appointed counsel had not received notice of the July 6 hearing, the court held another hearing on August 23, 1982. At the end of that hearing, the trial judge again ruled that the

---

**2.** Sometime prior to the two January 4 phone calls, Viola allegedly told Bencsik that Bencsik was late for a court date in his Bucks County criminal matter and therefore was subject to arrest. Bencsik stated, however, that he knew that he was not late for any hearings and that he neither believed nor was influenced by Viola's claim. App. at 112A–13A. Although Viola attempted to intercede in Bencsik's behalf, on January 6, 1982, Bencsik entered a plea of guilty in that case and was placed on probation.

tapes were admissible. The following morning, however, the judge reversed his ruling and held the tapes inadmissible. After hearing further oral argument on August 25, the trial judge issued his final orders excluding the tapes and their transcripts.

In his written opinion the trial judge stated that "[t]he critical factor in my decision to suppress the tapes was my determination that Edward Bencsik had not consented voluntarily to police monitoring of his conversations with the Kellys." *United States v. Stephen J. Kelly and Michael Kelly,* Crim. No. 82–00043, slip op. at 2 (E.D.Pa. Feb. 4, 1983). Citing *United States v. Santillo,* 507 F.2d 629 (3d Cir.), *cert. denied,* 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975), and section 802 of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 802, 82 Stat. 197, 212–23,[3] the trial judge ruled that, if Bencsik did not voluntarily consent to the recordings of the phone conversations then those recordings were an unreasonable invasion of the Kellys' privacy and had to be suppressed. *Kelly,* slip op. at 2–3. Reviewing the testimony the trial judge found that although Compton and Viola had not "applied directly any coercion, physical or psychological, to Bencsik to obtain his cooperation," *id.* at 6, his consent "was impermissibly clouded" by several factors: his possible drug use, his apprehension of physical harm at the hands of the Kellys, the pressure from Clarkson, the assurances of help from Viola and Compton, and Bencsik's own "highly suggestible nature." *Id.* at 8. Viewing all of the surrounding circumstances, the trial judge found that Bencsik's consent was not voluntary, and thus he suppressed the tapes.

## II

■ As properly recognized by the trial court below, it does not violate an individual's constitutional or statutory privacy interests to introduce at a criminal trial tape recordings of his private conversations if the other party to those conversations voluntarily consented to their recording. *United States v. Caceres,* 440 U.S. 741, 744, 99 S.Ct. 1465, 1467, 59 L.Ed.2d 733 (1979); *United States v. White,* 401 U.S. 745, 750–51, 91 S.Ct. 1122, 1125, 28 L.Ed.2d 453 (1971) (plurality opinion); *United States v. Moskow,* 588 F.2d 882, 891 (3d Cir.1978); *United States v. Santillo,* 507 F.2d 629, 631–34 (3d Cir.), *cert. denied,* 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975); *United States v. Osser,* 483 F.2d 727, 730 (3d Cir.), *cert. denied,* 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973); 18 U.S.C. § 2511(2)(c) (1976); *see* S.Rep. No. 1097, 90th Cong., 2d Sess. 66, 93–94, *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2153, 2182.[4] "The principle underlying [that rule] is that when one reveals information to an individual, one takes the risk that one's confidence in that individual is misplaced." *Flaherty v. Arkansas,* 415 U.S. 995, 999, 94 S.Ct. 1599, 1601, 39 L.Ed.2d 893 (1974) (Douglas, J., dissenting from the denial of certiorari). Neither the Constitution nor an Act of Con-

---

**3.** In enacting Title III Congress created a comprehensive scheme for the regulation of wiretapping and electronic surveillance. *Gelbard v. United States,* 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). The statute contains a strict exclusionary rule which prohibits the use of the contents of any communication "in any trial, hearing, or other proceeding in or before any court ... if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515 (1976). The Act provides, however, for several situations where disclosure is allowed. That part of the statute relevant to the instant appeal states:

(2)(c) It shall not be unlawful under this chapter for a person acting under the color of law to intercept a wire or oral communica-

tion, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c) (1976). *See generally United States v. Cianfrani,* 573 F.2d 835, 854–59 (3d Cir.1978).

**4.** In its opinion the district court addressed the consent issue in terms of privacy interests. For the purposes of this case, the district court's ruling that the Kellys' privacy interests were not violated because Bencsik voluntarily consented to the tape recordings is sufficient to establish the voluntariness requirement listed in footnote 11 of our opinion in *United States v. Starks. See Starks,* 515 F.2d at 121 n. 11.

gress affords protection "to a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). Thus no justifiable expectation of privacy is violated if the government subsequently uses that conversation at trial.

 Determining whether a person's consent to the recording of a phone conversation is "voluntary" is not a simple task. *See Culombe v. Connecticut,* 367 U.S. 568, 604–05, 81 S.Ct. 1860, 1880, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.). It is a question of fact, which the court must determine from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Sanford,* 673 F.2d 1070, 1072 (9th Cir.1982); *United States v. Brandon,* 633 F.2d 773, 776 (9th Cir.1980).[5] Consent to a wiretap is not voluntary where it is coerced, either by explicit or implicit means or by implied threat or covert force. *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048; *Osser,* 483 F.2d at 730. An individual's decision to allow the police to record a phone conversation, however, is not necessarily involuntary just because that individual's motives were self-seeking, or because he harbored expectations of personal benefit. *Moskow,* 588 F.2d at 891; *Osser,* 483 F.2d at 730. Rather consent will be considered voluntary if, from the totality of the circumstances, the trial court determines that the party agreeing to a wiretap did so consciously, freely, and independently and not as the result of a coercive overbearing of his will.

█ Turning to the instant case, the trial court was correct in looking at the totality of the circumstances to determine the issue of voluntariness. After a thorough and extensive review of the record, however, we must hold that the trial court erred when it determined that Bencsik did not voluntarily consent to the recording of his telephone conversations with the Kellys. The record reveals, as the trial court itself found, that Compton and Viola did not directly apply any coercion, physical or psychological, to Bencsik to obtain his cooperation in the monitoring of the telephone calls. *Kelly,* slip op. at 6; app. at 279A, 230A–31A, 238A, 248A. Bencsik testified that he consented to the recordings, app. at 89A, 99A, 105A, 227A–31A, and that he knew he did not "have to go along" with the police at the time he decided to cooperate, app. at 227A.[6] As the trial court stated, "there is no question" that he agreed to the tape recordings of his conversations with the Kellys. App. at 279A.

Despite the lack of official coercion, the trial judge refused to find that Bencsik voluntarily agreed to the recordings. While we agree with the trial judge that his examination of the circumstances is not limited solely to instances of governmental misconduct, *see* app. at 282A, 287A, we can not agree that the other factors identified by the judge lead to a finding in this case that Bencsik did not voluntarily consent to the tape recordings. First, the trial court pointed to Bencsik's possible drug use at the time the phone calls were recorded. The only evidence on the record about Bencsik's drug use was his own testimony. He stated

---

5. We reject the government's argument that the Second Circuit's decision in *United States v. Bonanno,* 487 F.2d 654 (2d Cir.1973), requires us to apply a different test for determining whether an informer consented to the monitoring or recording of a telephone call. The government contends that *Bonanno* holds that a district court, when determining voluntariness, should only examine whether an informer went ahead with a phone call knowing that it was being recorded by the police. We disagree. We read Judge Friendly's decision as merely recognizing that the factual issue of consent is slightly different in cases where the

defendant's consent to a physical search is at issue. In those cases the trial court has to determine whether the *defendant* voluntarily consented to a search contrary to his own interests, rather than whether an *informer* voluntarily consented to a decision "which he has ordinarily decided sometime previously and [which] entails no unpleasant consequences." *Id.* at 658.

6. On the same day that he made the second and third phone calls, Bencsik voluntarily went to the police station to be fitted with a body recorder. App. at 171A–72A.

that he could not specifically remember what drugs, if any, he had taken on January 2 or on January 4. He stated, however, that any drugs he might have taken did not impair his "ability to reason and [to] think things through." App. at 176A. Neither Compton nor Viola was aware that Bencsik was using any drugs at the time the phone calls were made. App. at 66A, 201A. As the trial court itself recognized, "[t]here is no evidence that those drugs impaired his judgment." App. at 237A. Second, the trial court cited the assurances of help from Viola and Compton in support of its finding that Bencsik's consent was not voluntary. Bencsik testified, however, that Viola's non-committal assurances of help in the Bucks County matter were not determinative in his decision to make the phone calls. App. at 99A, 105A. Bencsik was actually unaware that Viola ever interceded in his behalf. App. at 109A. Compton did eventually pay Bencsik $1000 out of DEA funds but it was Clarkson, not Bencsik, who initiated discussion about those funds, app. at 179A, 190A–91A, 202A, and that discussion did not occur until *after* Bencsik had made all three phone calls, app. at 108A, 168A, 185A; 189A–90A. Third, the trial court voiced concern about the pressure put on Bencsik by Clarkson. *See* app. at 165A, 223A–24A. Bencsik did testify that Clarkson had put him on the "spot," app. at 227A, yet stated that he still made the phone calls voluntarily and that he "realized [that he] really didn't have to go along with it" if he did not want to cooperate, app. at 227A, 230A.[7] Finally, the trial judge stated that based on his appearance at the August 23 hearing, he felt that Bencsik had a "highly suggestive nature." *Kelly,* slip op. at 8; app. at 247A, 280A, 282A–83A. While his testimony does reveal that Bencsik was somewhat confused at times at the August 23 hearing, there is no evidence in the record to indicate that Bencsik was incapable of making an independent free decision at the time the recordings were made.

We hold that the instant record clearly establishes that Bencsik voluntarily consented to having his phone conversations with the Kellys recorded. Bencsik repeatedly and consistently testified that he voluntarily agreed to the monitoring of the calls by Compton. The record does not show that his drug usage prevented him in any way from consciously and independently reaching his decision. *See United States v. Marcello,* 508 F.Supp. 586, 599–601 (E.D. La.1981); *United States v. Cafaro,* 480 F.Supp. 511, 521–22 (S.D.N.Y.1979). Bencsik's decision to cooperate, although perhaps self-serving, was not based on inducements which rose to the level of an overbearing of his will. *See United States v. Horton,* 601 F.2d 319, 322 (7th Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *Moskow,* 588 F.2d at 891; *United States v. Juarez,* 573 F.2d 267, 278 (5th Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *Osser,* 483 F.2d at 730. Finally, even if Bencsik was put on the spot by Clarkson, the evidence does not establish that he was unable to make an independent judgment about whether to assist the police at the time the phone calls were recorded. We acknowledge the district court's primary role in making the determination of voluntariness, and we recognize the careful approach to the problem by the trial judge below. On this record, however, we must hold that his conclusions were erroneous. Fed.R.Civ.P. 52(a).

### III

We will reverse the district court's orders of August 25, 1982, suppressing the tape recordings and their transcripts, and we will remand this cause to the district court for further proceedings consistent with this opinion.

GIBBONS, Circuit Judge, dissenting.

The government appeals from an order suppressing a recording of a telephone con-

---

7. The district judge also noted in his opinion that Bencsik's "apprehension of death or physical harm at the hands of the Kellys," *Kelly,* slip op. at 8, was a factor which "clouded" Benc-

sik's consent to the wiretap. We disagree. The Kellys will not be heard to complain that their threats tainted Bencsik's consent to assist the police. *See* app. at 283A–84A.

versation. It is undisputed that section 802 of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 802, 82 Stat. 197, 212–23, 18 U.S.C. § 2515, mandates suppression unless "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c) (1976). The majority holds that the voluntariness of such consent controls as a matter of law the suppression of the recording, and that voluntariness is a question of fact which the court must determine from the totality of the circumstances. I completely agree with the majority that "consent will be considered voluntary if, from the totality of the circumstances, the trial court determines that the party agreeing to a wiretap did so consciously and independently and not as a result of a coercive overbearing of his will." Maj. op. p. 125. Thus I join in the majority's tacit rejection of the government's contention that for purposes of the wiretap statute consent should be equated with mere knowledge of what the law enforcement officers want.[1] The test is whether voluntariness, in the classic sense of uncoerced free choice, exists. Such voluntariness is determined from the totality of the circumstances, and, at least with respect to statutory issues such as that before us, this inquiry is factual. Moreover I agree with the majority that since voluntariness of the consent is a factual matter the scope of review is the clearly erroneous standard of Fed.R.Civ.P. 52(a).

At that point we part company. While the evidence certainly did not compel the conclusion that Edward Bencsik's consent to interception of telephone conversations to which he was a party was coerced, I am unable to hold that the carefully considered conclusion of the trial court to that effect "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972). Certainly the majority has not established the existence of either of those

factors. The *Krasnov v. Dinan* standard for determining when a trial court's finding of fact is clearly erroneous should be applied rigorously in all cases, but especially in cases where, as here, the factual determination depends so much upon the factfinder's face to face evaluation of the witnesses. Rule 52(a) explicitly cautions that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Judge Cahn relied, in making his finding of coercion, on two factors. First, his assessment of Bencsik was that he has a suggestible character. We did not see or hear Bencsik, and we are in no position to second-guess Judge Cahn with respect to that character trait. Second, he concluded that Bencsik was on drugs during the period in which he gave his consent. The government urges that drug-taking does not necessarily affect capacity to consent. While this is true, it does not follow that drug taking *never* affects capacity to consent. Methamphetamine could have heightened Bencsik's feelings of peril and caused him to perceive that he had no choice but to cooperate. Marijuana could have increased his suggestibility. There is evidence that both were used. The record also contains several instances of faulty memory. Finally there is evidence from which a factfinder could conclude that Police Chief Viola and Charles Clarkson exerted pressure on Bencsik to record this telephone conversation with Mr. Kelly.

After considering carefully over a period of more than twenty-four hours the impression that Bencsik made, and his testimony about the totality of circumstances in which he consented to record his telephone conversations, the court found as a fact that his consent was coerced. There is evidentiary support which bears a rational relationship to that finding. This court, which never saw or heard the witnesses, cannot substitute its own finding of fact for that of the trial judge who did. *Pullman-Standard v.*

---

1. This contention is predicated on a perhaps overbroad reading of *United States v. Bonanno,*

487 F.2d 654, 658–59 (2d Cir.1973).

*Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Thus I would affirm the order appealed from. Suppression is required by 18 U.S.C. § 2515 (1976).