**UNITED STATES of America,**
**Appellant,**

v.

**Michael S. ANTOON; John A. Bettor;**
**Xavier W. Folino d/b/a**
**Fairview Pharmacy.**

**No. 90–3739.**

United States Court of Appeals,
Third Circuit.

Argued April 9, 1991.

Decided May 13, 1991.

Rehearing and Rehearing In Banc
Denied June 5, 1991.

4. Judge Alito concurs in the result based on the binding effect of our decision in *United States v. Inigo.*

Paul J. Brysh, Bonnie R. Schlueter (argued), Office of U.S. Atty., Pittsburgh, Pa., for appellant.

William P. Weichler (argued), Ambrose & Friedman, Erie, Pa., for appellee Michael S. Antoon.

Before STAPLETON, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal concerns the admissibility in a criminal trial of statements and conversations recorded by a witness wearing a concealed body recorder. The central issue is whether the witness' cooperation was voluntary or coerced. The district court excluded the evidence because it found that the witness' free will was overborne by his fear that he would be indicted as a co-conspirator if he refused to cooperate. Because we hold the district court clearly erred in concluding that the witness' consent was involuntary under the circumstances, we will reverse.

### I.

Defendant Michael S. Antoon, M.D. and Donald Millar have been friends for more than ten years. They became acquainted through Millar's work as a paramedic servicing the Erie, Pennsylvania hospital where Antoon works as an emergency

room physician. Over the years, they have become close social companions.

In 1988, the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Agency ("DEA"), and the Pennsylvania State Police launched a narcotics investigation of Antoon. They suspected that he was issuing phony prescriptions to obtain drugs to distribute illegally. On March 1, 1989, the three agencies executed a search warrant at Antoon's residence. Pursuant to the warrant, the agencies seized medical records, including copies of prescriptions, financial records, and various other documents from Antoon's home. Some of the prescriptions seized were written by Antoon to Millar for controlled substances.

Acting on this lead, Trooper Charles Lewis of the Pennsylvania State Police contacted Millar on May 2, 1989. Lewis telephoned Millar, told him he wanted to talk about Antoon, and arranged to interview Millar at his home later that day. At the meeting, which lasted approximately one hour, Lewis confronted Millar with copies of the prescriptions seized from Antoon's residence written in Millar's name. Lewis opined that the prescriptions were not issued for valid medical reasons and asked Millar if he had been aware of the improper purpose at the time. Millar admitted that he had been. He then confessed that he returned the pills to Antoon after filling the prescriptions.

Frightened by his conversation with Lewis, and aware that he potentially faced criminal charges for his involvement, Millar tried unsuccessfully to contact Antoon from May 2nd to May 11th. During that interval, Millar met with Lewis and other agents several times. At those meetings, Lewis and others suggested that Millar help the government. They asked Millar to wear a body recorder to record incriminating conversations with Antoon. They reminded Millar that he could be indicted as a co-conspirator and told him that he would not be indicted if he wore the body recorder. They also reminded Millar that he could lose his job if he became implicated in a criminal matter. Millar, however, testified that no one told him he would be charged with a crime or lose his job if he refused to wear the wire.[1] Although Millar initially refused to help, he claimed that his resolve eroded when he was unable to contact Antoon. On May 11, 1989, Millar agreed to wear the body recorder and signed a consent to that effect.[2]

After obtaining Millar's signed consent in which he acknowledged that his consent was voluntarily given, the agents fitted a Nagra body recorder on Millar. Later that day, Millar met with Antoon and recorded an incriminating conversation in which Antoon vaguely acknowledged that Millar would return to Antoon the drugs Antoon ostensibly prescribed for Millar. Millar subsequently attempted to arrange other conversations, but was unsuccessful.

On February 16, 1990, a federal grand jury indicted Antoon on various drug charges. The thrust of the indictment is that Antoon conspired to issue phony prescriptions in order to obtain and distribute controlled substances.[3] Millar was not indicted as a co-conspirator.

1. Q: Did anyone say, if you don't wear this wire you will be charged with a crime?
A: No.
Q: Did anyone say, if you don't wear this wire you'll lose your job?
A: No.
Q: Did anyone hold a gun to your head, or in another way say you have to wear this wire and go in there today?
A: No.
App. at 161.

2. The consent read:
I, Donald R. Millar ... hereby authorize Charles Lewis, PSP, and Thomas D. Langer Special Agent of the Federal Bureau of Investigation, United States Department of Justice to place a body recorder and transmitter on my person for recording any conversations with Michael Antoon and others yet unknown which I may have on or about 5/11/89, and I have given this written permission to the above-named special agents voluntarily, without threats or promises of any kind.
App. at 133–134.

3. Specifically, Count I alleges that Antoon conspired to distribute and possess with intent to distribute Schedule II controlled substances in violation of 21 U.S.C. § 846. Count II alleges that Antoon conspired to acquire and possess Schedule II controlled substances by fraud and deception in violation of 21 U.S.C. § 846. Counts III through CXIII allege that Antoon

On April 24, 1990, Antoon filed a motion to suppress the conversations Millar recorded on May 11, 1989. Antoon contended that Millar had not cooperated with law enforcement officials voluntarily. At a pretrial hearing, Millar testified about the circumstances under which he consented to wear the body recorder. Based on Millar's testimony, the district court concluded that Millar's consent was involuntary, and ordered that the incriminating conversation was inadmissible. This appeal by the government followed. We have jurisdiction pursuant to 18 U.S.C. § 3731.

## II.

■ Under federal law, it is illegal to use the contents of an electronically recorded conversation, unless a party to that conversation consents. Specifically, 18 U.S.C. § 2511(1)(d) makes it illegal to use the contents of any wire, oral, or electronic communication where the information was obtained through an interception in violation of section 2511(1).[4] Under 18 U.S.C. § 2511(2)(c), it is not unlawful for a person acting under color of law to intercept a communication, where a party to that communication has given prior consent.[5] Because of section 2511(1)(d), the United States cannot *use* intercepted communications in a criminal prosecution unless a party to the communication first consented to the interception pursuant to section 2511(2)(c). In the case at bar, the United States cannot use the conversation Millar recorded against Antoon unless Millar gave prior consent to record it.

■ Although the right at stake in an exclusionary hearing to prevent admission of conversations recorded in violation of 18 U.S.C. § 2511 is statutory, not constitutional, we look to Fourth Amendment precedent to determine whether a party to a communication consented to an interception within the meaning of 18 U.S.C. § 2511. *See, e.g., United States v. Kelly,* 708 F.2d 121, 125 (3d Cir.), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983) (*citing Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) as setting forth the relevant contours of what constitutes voluntary consent). We must therefore apply *Bustamonte* to determine whether Millar's consent to wear the body recorder was "free" and "voluntary."

■ Under the *Bustamonte* framework, consent is a question of fact determined from the totality of the circumstances. Under the totality of the circumstances test, consent is not voluntary merely because a person makes a "knowing" choice among alternatives. *Bustamonte,* 412 U.S. at 224, 93 S.Ct. at 2046. The ultimate test of voluntariness is whether, under the circumstances, the consent was an exercise of free will or whether the actor's free will "has been overborne and his capacity for self-determination critically impaired." *Id.* at 225, 93 S.Ct. at 2047.[6] Consent to a wiretap is not voluntary where "it is

---

substantively violated 21 U.S.C. § 841(a)(1) by unlawfully distributing controlled substances. Counts CXIV through CXLV allege that Antoon violated 21 U.S.C. § 843(a)(3) by acquiring controlled substances by fraud.

4. 18 U.S.C. § 2511(1) reads:

(1) Except as otherwise specifically provided in this chapter any person who—
(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

5. 18 U.S.C. § 2511(2)(c) reads:

(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

6. The Court lists some factors that can affect the balance in particular cases. They include the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as sleep or food deprivation. *Bustamonte,* 412 U.S. at 226, 93 S.Ct. at 2047.

coerced, either by explicit or implicit means or by implied threat or covert force." *Kelly*, 708 F.2d at 125. Thus, we must examine the circumstances surrounding Millar's consent to determine if it was a product of his free will, or whether his will was overborne by explicit or implicit means.

■ Our inquiry into the voluntariness of Millar's consent is restricted. We must accord the district court's conclusion that Millar's consent was involuntary great deference, unless our examination of the record shows that the district court committed clear error. *United States v. Hashagen*, 816 F.2d 899, 906 (3d Cir.1987). The district court's conclusion will stand unless it "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir.1972).

### III.

■ The core issue of this appeal then is whether there is any evidence to support the district court's conclusion that Millar's consent was coerced. Based on our review of the record, we conclude the district court committed clear error. Because our inquiry is fact specific, we attach the relevant portions of Millar's testimony as an appendix to this opinion.

Millar's testimony is devoid of minimum evidentiary support for the conclusion that his consent was involuntary. In his direct examination, Millar explained why he decided to wear the body recorder. "I voluntarily decided to cooperate because I had had a lack of conversation from Dr. Antoon concerning the situation." App. at 134.[7] Because Millar was unable to contact Antoon after he was approached by the authorities, he was left to fend for himself. Millar was, as the saying goes, between a rock and a hard place. He could refuse to cooperate with the authorities and risk going to jail himself, or he could betray his

friend, help the government, and stay out of jail. Millar decided to cooperate.

Millar offered another explanation for his cooperation—the desire to clear his name.

It was initially indicated to me that there was discussion that the prescriptions were in my name and were supposedly asked for by me, and I just wanted to clear my name as far as the indications that all those prescriptions were for my person.

App. at 134. Millar evidently thought he had more to lose from allowing people to believe that he was using drugs, than from betraying his close friend.

Antoon concedes that Millar's direct examination strongly suggests that Millar's consent was voluntary, but argues that Millar's testimony on cross-examination showed that he consented only after his will was overborne by the authorities. On cross-examination, Millar was asked repeatedly by defense counsel if he felt trapped by the circumstances that led him to agree to wear the body recorder. Each time, he said that he had. Millar was also asked whether he was scared. He agreed that he was. Millar also acknowledged that in his conversation with Antoon, he had described himself as feeling "squeezed" by the authorities. App. at 153–54.

The district court explicitly relied on this testimony in reaching its conclusion that Millar's free will was overborne. Antoon argues that we should defer to the district court's factual findings—i.e. that Millar's direct testimony was not believable and that his true feelings were expressed only on cross-examination. We cannot agree, however, that the determination of whether Millar's consent was voluntary hinges in this case on witness credibility. The salient facts are not in dispute. In addition, on redirect, Millar explained what he meant when he said he had no choice but to cooperate. He explained, "I just felt that I was

7. References to pages in the Appendix are to the appendix record prepared by the parties on appeal, not the appendix attached to this opinion.

in a situation that required me to do whatever was asked of me." App. at 161.

Obviously, it was Millar's apprehension of prosecution that persuaded him to cooperate, not any coercive statement or intimidation by any law enforcement official. Moreover, Millar testified that no one directly threatened to prosecute him if he refused to wear the body recorder. No one said that he would lose his job if he failed to cooperate. He agreed that no one ever "held a gun to his head" and told him he had to wear the body recorder, or else. In sum, Millar never once said that his consent was involuntary or indicated that his will was overborne. While it may be true that he felt trapped (although he never used that word himself), there is no indication that Millar did anything but knowingly and intentionally choose between two unpleasant alternatives. Significantly, Millar testified in his own words that "I voluntarily decided to cooperate." App. at 134.

Other circumstances also lead us to conclude that Millar's consent was voluntary. First, Lewis telephoned in advance and asked Millar if he could interview him about the ongoing Antoon investigation. Millar agreed. The fact that Lewis contacted Millar in advance and Millar agreed to meet Lewis at his home indicate that the meeting was voluntary, that Millar was not surprised by the visit, and that he had an opportunity to retain counsel. Second, the meeting with Lewis took place at Millar's home, in familiar, non-hostile surroundings. Millar was not detained for any period. Third, Millar went to the next meeting at the FBI office by invitation—again he was not forced to go and could have refused. Fourth, nine days elapsed between the time agents first suggested that Millar wear the body recorder and the time he actually agreed to do so. Millar had an opportunity to reflect and could have consulted an attorney during that time. Fifth, although authorities stated that they would *not* prosecute Millar if he wore the body recorder, no one said that they would prosecute him if he did not. Finally, Antoon has conceded that nothing the authorities did constituted police misconduct. These circumstances, together with Millar's own testimony demonstrate that the district court's conclusion that Millar's consent was involuntary is without support in the record.

Our conclusion is bolstered by the application of principles of voluntary consent in two cases involving allegedly illegal recordings. In the first, *United States v. Osser*, 483 F.2d 727, 730 (3d Cir.), *cert. denied*, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973), we held that a party's having hoped to benefit from his decision to allow the government to intercept and record a telephone conversation did not impair the voluntariness of consent for the purposes of the rule forbidding electronic surveillance. We noted in *Osser*, however, that the actor's consent was free from a potentially coercive element present in this case. No implied threats were made to the cooperating witness, while in this case we recognize that there was hovering over Millar an implied threat of prosecution. *Id.* We are not persuaded, however, that under the circumstances of this case, that additional facts vitiated Millar's consent.

In *Kelly*, we wrote, "An individual's decision to allow the police to record a phone conversation ... is not necessarily involuntary just because that individual's motives were self-seeking, or because he harbored expectations of personal benefit." *Kelly*, 708 F.2d at 125 (*citing United States v. Moscow*, 588 F.2d 882, 891 (3d Cir.1978)). We stated, "[C]onsent will be considered voluntary if, from the totality of the circumstances, the trial court determines that the party agreeing to a wiretap did so consciously, freely, and independently and not as a result of coercive overbearing of his will." *Kelly*, 708 F.2d at 125. *See also United States v. Kolodziej*, 706 F.2d 590 (5th Cir.1983) (reversing the district court's decision to exclude intercepted communications because the district court's conclusion that consent was involuntary lacked support in the record). The district court's conclusion in *Kelly* rested on evidence that the cooperating witness may have consented while under the influence of drugs, that he feared physical pressure from the defendants whose conversations he agreed to record, that he was pressured by law en-

forcement officials, and that he was highly suggestible.

In reversing the district court, we stated, "The record reveals ... that [the law enforcement officials] did not directly apply any coercion, physical or psychological ... to obtain his cooperation in the monitoring of the telephone calls." *Kelly*, 708 F.2d at 125. In addition, the cooperating witness admitted that he knew he did not "have to go along" with the police when he decided to cooperate and that he did agree to allow the conversations to be recorded.

The record in this case is similar. Law enforcement officers did not directly apply any pressure. They merely told Millar what he admits he already knew—he could suffer serious consequences as a result of his illegal conduct. Millar's strongest statement to the contrary came in response to extremely leading questions on cross-examination when he testified that he felt "trapped," "squeezed," and "a lot of pressure." We must, however, consider this in light of his previous testimony in response to a question as to whether he had been intimidated or coerced when he stated there was always a "form of intimidation, of concern, but no, I voluntarily decided to cooperate because I had a lack of conversation from Dr. Antoon." App. at 134. We cannot say that any pressure Millar experienced was caused by the government offer. The pressure stemmed from Millar's knowledge that the government possessed substantial evidence linking Millar to a serious drug offense. Indeed, there is no evidence anywhere in the record before us that Millar felt more pressure to cooperate than any potential criminal defendant feels who has done wrong and been caught.

### IV.

Under the circumstances, we cannot agree that Millar's will was overborne by the authorities. There is no evidence that law enforcement officials did anything to overcome Millar's free will. Rather, the evidence upon which the district court relied merely explains Millar's motive for cooperating. He could not reach Antoon, he wanted to clear his name, and he was trying to stay out of jail. No one improperly threatened to prosecute Millar if he refused to wear a body recorder. No one threatened to do anything which in any way would have been illegal or inappropriate. Of course, Millar did not *want* to hurt his friend, but he voluntarily chose to do so in the hope of minimizing the penal consequences of his own misconduct. The district court's conclusion that Millar did not voluntarily consent to wear the body recorder is clearly erroneous.

We will reverse the order of the district court which excluded the proffered evidence.

### APPENDIX

*Direct Examination*

Q: Did anyone threaten, coerce, or intimidate you in any way on that particular date into wearing the wire?

A: It was always—as I've stated before, there's always a form of intimidation, of concern, but, no, I voluntarily decided to cooperate because I had had a lack of conversation from Dr. Antoon concerning the situation.

Q: All right. And can you tell the Court, please, why it was that you agreed to do this and why you went in to obtain this tape?

A: It was initially indicated to me that there was discussion that the prescriptions were in my name and were supposedly asked for by me, and I just wanted to clear my name as far as the indications that all those prescriptions were for my person.

App. at 134.

*Cross–Examination*

Q: You obviously knew, did you not, that criminal charges could be brought as a result of your involvement with these particular prescriptions?

A: Yes.

Q: And that made you scared; didn't it?

A: Yes.

Q: At a subsequent meeting you say that criminal charges were dis-

cussed. Did they discuss what particular criminal charges you were facing?

A: Conspiracy.

\* \* \* \* \* \*

Q: Mr. Millar, when you met with Trooper Lewis, it's fair to say you were pretty scared; isn't that true?

A: That's correct.

Q: In fact, it's fair to say that you were very scared; isn't that true?

A: I was nervous about the situation, yes.

Q: You were afraid you were going to be charged with criminal violations here in Federal Court; isn't that correct?

A: That's correct.

Q: You were afraid you were going to be charged and convicted, and ultimately go to jail; isn't that correct?

A: I wasn't certain at that time what would happen.

Q: You were concerned about being convicted and going to jail; weren't you?

A: There's the possibility that existed, yes.

Q: And Trooper Lewis never told you you would not go to jail; did he?

A: No.

Q: Now, you also were concerned, were you not, about your job?

A: Yes.

\* \* \* \* \* \*

Q: In fact, if you lost that particular job you don't know what you would do; isn't that true?

A: That's true.

Q: You were thinking about that at that particular time you were talking to Trooper Lewis as well; isn't that correct?

A: That's correct.

\* \* \* \* \* \*

Q: You're talking to Trooper Lewis on May 2nd and you're thinking about all of these different things; isn't that true?

A: Yes.

Q: Your mind was racing; wasn't it?

A: I suppose.

Q: It's fair [to] say that you were close to a panic stage; isn't that true?

A: I don't know if you'd call it a panic stage. I was concerned.

\* \* \* \* \* \*

Q: After these meetings that you had with the agents between May the 2nd and May the 11th, or sometime during their occurrence, you began to look for a way out; isn't that true?

A: I'd assume, yes.

Q: You began to look for a way that you could get yourself out of this trap that you found yourself in; isn't that true?

A: Correct.

Q: And that's how you saw yourself, didn't you? You saw yourself as being trapped; isn't that true?

A: I believe that's [a] likely statement, yes.

\* \* \* \* \* \*

Q: And during this particular meeting there was discussion, wasn't there, about the criminal charges that you potential[ly] faced?

A: Yes.

Q: And there was also discussion regarding your particular job, as you have already testified; isn't that correct?

A: That's correct.

\* \* \* \* \* \*

Q: And when you were finally in this particular position and there were four agents in the room, at that point in time they suggested to you that you wear a wire; is that correct?

A: That's correct.

Q: And they told you that any cooperation that you provided would be brought to the attention of the Court, or perhaps you would receive no charges at all; is that correct?

A: That's correct.

Q: In fact, they told you you wouldn't be charged; isn't that correct?

A: That's correct.

Q: But the only way that you wouldn't be charged is if you wore a wire; isn't that correct?

A: That's not how—what they indicated.

Q: That was your understanding, however; wasn't it?

A: At that time probably, yes.

Q: Regarding your decision to wear this particular wire, having found yourself in this trap that we've talked about, you didn't see yourself as having any real alternative; isn't that true?

A: True.

\*    \*    \*    \*    \*    \*

Q: But the only reason you chose to wear the wire was because of the trap you found yourself in; isn't that true?

A: That's true.

Q: That was a bit of a dilemma for you, wasn't it?

A: Very much so.

Q: Now, one of the ways that you've testified that you felt in dealing with these agents was that you felt you were trapped.

It's also fair to say that you felt that they were squeezing you; isn't that true?

A: There was a lot of pressure, yes.

Q: In fact, the word "squeeze" was a word that you used, isn't that true, in your conversation with Mike Antoon?

A: Could have been. I don't recall exactly.

\*    \*    \*    \*    \*    \*

[Millar reads a portion of transcript of tape recorded conversation]

Q: Okay. Now, does that refresh your recollection as to whether or not you used the word "squeeze" in describing how the agents were dealing with you?

A: Yes, it does.

Q: You used that word; didn't you?

A: Yes.

Q. And you weren't lying when you used that word; were you?

A: No.

Q: You were telling Mike Antoon the truth; isn't that true?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: But the bottom line is that when you put that recorder on and you agreed to go and engage Mike Antoon in conversations, you felt like you had no choice; isn't that true?

A: Yes.

App. at 142–143, 145, 146, 147, 149, 150–154, 160.

*Redirect Examination*

Q: Mr. Millar, you said you had no choice. Explain what you meant.

A: I just felt that I was in a situation that required me to do whatever was asked of me.

Q: Those were your feelings?

A: Yes.

Q: Did anyone say, if you don't wear this wire you will be charged with a crime?

A: No.

Q: Did anyone say, if you don't wear this wire you'll lose your job?

A: No.

Q: Did anyone hold a gun to your head, or in another way say you have to wear this wire and go in there today?

A: No.

Q: When you first talked with Trooper Lewis about wearing this wire, how many days in advance of actually wearing the wire, approximately, elapsed?

A: I don't recall. It was a week, two weeks, I don't know. I don't recall.

Q: So, you had a lot of time to think about it; did you not?

A: Yes.

App. at 161.

*Recross Examination*

Q: Mr. Millar, Mr. Ross asked you if you had a long time to think about this particular consent?

The fact of the matter is, the more you thought about it, the more trapped you felt; isn't that true?

I don't know if I'd indicated [sic] as a trapped feeling; a very stressful feeling.

App. at 163.