**UNITED STATES of America,
Plaintiff,**

v.

**Ira L. MOORE, Defendant.**

**No. Crim. 98–CR–193–WM.**

United States District Court,
D. Colorado.

May 18, 2000.

Linda A. McMahan, James Allison, Office of the U.S. Attorney, Denver, CO, for plaintiff.

Virgina Grady, Office of the Federal Public Defender, Denver, CO, for defendant.

## ORDER ON MOTION TO EXCLUDE

MILLER, District Judge.

This matter is before me on defendant's Motion to Exclude Evidence of Tape Recorded Conversation. The parties presented evidence and argument at different hearings and filed supplemental briefs thereafter. For the reasons discussed below, I will grant the motion.

### Background and Factual Findings

Defendant is implicated in the armed robbery of Cal's Sporting Authority, a federally-licensed firearms dealer, in April 1998. A confidential informant provided descriptions of the participants that led police to co-defendant Kevin Shuler; the informant also mentioned the involvement of someone named "Iroc" or "Roc."

Shuler was arrested on April 24, 1998, at his place of work. Law enforcement officers learned that Orchid Field, Shuler's common law wife and mother of his unborn child, was on her way to Shuler's work site. Anticipating that Field could have information that would lead to the identification and arrest of "Iroc" or "Roc," the officers remained at the site. Around noon on that day, Field approached the work site in her car for a planned lunch-hour meeting with Shuler. (She was unaware of his earlier arrest.)

As Field prepared to park at the site, police vehicles boxed her car in. Numerous armed officers (estimated to be ten to fifteen officers or more) surrounded her car, yelling at her to get out of the car;[1] when Field "froze" with her hands on the wheel, one officer had to reach into the car to put it in park. Field exited her vehicle and, upon request, gave oral consent to the search of the car.[2] The officers testified that they asked her if she would accompany them, in her own car, to the Arapahoe County Sheriff's Office to answer some questions about the gun store robbery. Although the officers stated that Field was not under arrest, she testified that she thought she had no choice and believed that she was under arrest. In any case, the command decision was to contact Field and have her come to the Sheriff's Office. There is no evidence that she was told she was free to leave or to refuse to go with the officers.

Because she did not know its location, the officers offered to escort her to the Sheriff's Office. The "escort" consisted of two cars, one in front of Field's car and the other behind. In addition, an officer went with her as a passenger in her car. Field arranged with the officers to stop on the way to fill up her car with gas. When she went to the restroom at the gas station, an officer waited outside the restroom door.[3]

---

1. Field recalled that some officers displayed weapons.

2. Upon later request, Ms. Field signed a written consent form authorizing the search of her car. The validity of her consent to this search is not before me.

3. A second stop along the way to the Sheriff's Office occurred when officers received radioed instructions to ask Field if she would consent to a search of the home she shared with her mother and Shuler. Although the parties dispute whether Field voluntarily con-

Field and her escort reached the Sheriff's Office some time after 1:00 p.m. Field was led to a small interrogation room, complete with one-way mirror, in the restricted area of the Sheriff's Office (ingress to, and egress from, the area was by card key). Soon after her arrival, she was advised of her *Miranda* rights and signed a form acknowledging that advisement. Field testified that the officers told her that, if she wanted a lawyer, they would hold her until she got one. Field, believing she had done nothing wrong, indicated she did not want to wait for a lawyer. Officers began to question her regarding her relationship with Shuler, her knowledge of the robbery and/or the stolen firearms, and her knowledge of "Iroc" or "Roc." During the course of the questioning, which lasted approximately five hours, two to four officers were in the room with Field at all times; she did ask two of the officers to leave the room because they upset her, and the officers complied. When she was allowed to go to the bathroom or outside the building to smoke, she was escorted by at least one officer. She was provided beverages and offered something to eat.

Field was never formally charged with involvement in the robbery or any other crime. Indeed, the officers conceded that they did not ever have probable cause to believe Field participated in the robbery. In spite of the lack of evidence against her, the officers did tell Field, expressly and implicitly, that they believed she was lying and that they suspected her of some involvement in the robbery as an accomplice, getaway driver, or otherwise. At least two of the officers threatened her with the possibility that she would have her baby in jail, and she was asked how she could be a good mother if she were in jail. She was also told that Shuler did not love her or he would have cleared her name. The questioning was at times accusatory and aggressive and included officers yelling at Field.

sented to the search, I have upheld the resulting search as valid based upon the consent to

The course of the questioning changed somewhat when the search of Field's residence yielded a bag containing some of the stolen firearms in a closet shared by Field and Shuler. When Field was informed of this, she conceded that she was aware of the bags, if not also of the guns, and became more forthcoming with information relevant to the investigation. She was told that, because the guns were found in her residence, both she and her mother could be "brought down" or charged with crimes.

Also during the afternoon, officers had tentatively identified defendant Moore as Shuler's accomplice "Iroc" or "Roc." After Field acknowledged that she knew of defendant, the officers asked if she would participate in a tape-recorded telephone conversation with defendant in an effort to gather further evidence against him.

The parties dispute the tenor of the request that Field participate in the phone call. Field testified that she did not wish to do so but ultimately agreed because it was her "way out"; that is, she believed if she made the phone call she would be permitted to leave instead of being charged or further detained. The officers denied any threat or even unwillingness on her part except that she expressed concern about her own and her mother's safety and asked if her cooperation could be kept secret. The officers told her that they would try but she might have to testify. Special Agent Motte testified he told her he needed her consent to make a taped phone call and that the decision was hers.

Testimony provided by Special Agent Motte on direct examination, however, supports Field's characterization or perception of the request as her "way out" in return for her assistance with the call:

I basically told her she was basically implicated in this, due to being associated with Kevin Shuler residing at the apartment where all these—a number of the firearms stolen from Cal's Sporting

search given by Field's mother.

Armory—were located in this closet. I said, you can basically help yourself on this. What we would like to do is place a monitor called to Ira Moore and see if we can get some conversation as to where the remaining firearms are located.

Sept. 9, 1999 Transcript, p. 20

Field was told she was implicated in the robbery (expressly, by Agent Motte, and implicitly, by the other officers' statements that she was lying and their threats that she would go to jail). It would not be unreasonable for Field to believe, given her situation, that the phone call was her "way out" of her perceived (and threatened) custody, particularly given the circumstances of the day.

During the entire course of the encounter with Field, from the stop at Shuler's work place to the time she was escorted to her car and allowed to go home approximately six hours later, none of the officers ever told Field that she was free to terminate the interview and leave the Sheriff's Office. Although the officers testified that she was free to leave, they stated that they did not tell her so because she did not ask. Indeed, the one time Field did ask if she could leave, after she made the call to defendant Moore, she was told she needed to wait and, only later, was ultimately escorted out to her car.

### Discussion

Defendant seeks to exclude evidence of the recorded conversation between defendant and Field on April 24, 1998, arguing that the law enforcement agents did not have Field's informed and voluntary consent.

▆▆▆ Federal law prohibits the use of electronically recorded communications where the information was obtained through an interception in violation of 18 U.S.C. § 2511(1). The law permits law enforcement officers to monitor or record telephone conversations, however, so long

as they have the consent of one of the parties to the conversation. 18 U.S.C. § 2511(2)(c);[4] *United States v. Davis,* 1 F.3d 1014, 1016 (10th Cir.1993). In this case, the burden is on the government to establish that Field's consent was knowing and voluntary. *United States v. McKneely,* 69 F.3d 1067, 1073 (10th Cir.1995) ("If the defendant raises the question whether the consent was knowing and voluntary, the burden of proof then falls on the government to establish the consent").

Neither party addresses the apparent split among the circuits as to the standard used to determine whether consent to a recorded conversation is voluntary. The majority view, traced to the Second Circuit and applied by the Tenth Circuit, is "less stringent than that required to show consent for a physical search" and normally consists merely of a showing "that a party engaged in a conversation with the knowledge that it was being recorded." *United States v. Abreu,* 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd,* 935 F.2d 1130 (10th Cir.), *cert. denied,* 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991). *See United States v. Bonanno,* 487 F.2d 654, 658–59 (2nd Cir.1973) (distinguishing between consent to physical search and consent to monitoring or recording of telephone conversation and concluding that "it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about"). In at least two cases, the Tenth Circuit has cited the lesser standard applied by the Second Circuit in *Bonanno. See United States v. Skipworth,* 697 F.2d 281, 283 (10th Cir.1983); *United States v. Axselle,* 604 F.2d 1330, 1338 (10th Cir.1979).

The opposing view, adopted by the Third Circuit, requires that the government show, based upon the totality of the circumstances, that "the party agreeing to

---

**4.** Section 2511(2)(c) states: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where

such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

a wiretap did so consciously, freely, and independently and not as the result of a coercive overbearing of his will." *United States v. Kelly*, 708 F.2d 121, 125 (3rd Cir.), *cert. denied*, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983). *See generally United States v. Phelan*, No. 97CR678 (N.D.Ill. October 19, 1999) (1999 WL 1009869) (comparing majority and minority views).

Although the general statement of the majority view does not expressly address the issue of voluntariness, it does not follow that evidence of police coercion is irrelevant under that test. In *Skipworth*, the Tenth Circuit rejected a contention that the informant's consent was coerced based on the facts before it, noting there was no evidence of coercion, no promise as to leniency, and overwhelming evidence of consent in the recording of over 100 telephone and body recordings made over the course of several months. 697 F.2d at 283. The court expressly stated that "[n]o pressure was exerted ... to deprive her of a free and rational choice." *Id.* In *United States v. Davis*, 789 F.Supp. 1130, 1133 (D.Kan. 1992), the court, applying the *Bonanno* standard, stated that "despite its literal language, *Bonanno* requires the court to examine more than merely whether an informant went ahead with the conversation knowing that it was being recorded by the police". The *Davis* court went on to state that "[i]n determining whether an informant had consented to being recorded, the court must look at whether the informant agreed to the wiretap 'consciously, freely and independently, and not as the result of a coercive overbearing of his will.'" 789 F.Supp. at 1133 (quoting *Kelly*, 708 F.2d at 125).[5]

I conclude that the two standards address, in essence, the two different prongs of the government's burden in proving the validity of consent: knowledge and voluntariness. The *Bonanno* test ensures that a party knows that law enforcement officers will record his or her conversation for purposes related to a criminal investigation. In contrast, the *Kelly* test focuses on whether the party's agreement to participate in the recorded conversation is made under circumstances free of coercion or duress. The cases applying the different standards generally bear this out. *Compare Axselle*, 604 F.2d at 1338 (citing *Bonanno* and addressing knowledge) *with United States v. Antoon*, 933 F.2d 200, 203–04 (3rd Cir.) (applying *Kelly* and focusing on issue of coercion), *cert. denied*, 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991).[6] While consent in some cases may be shown solely with evidence that the party knows a call is to be recorded, in other cases the circumstances surrounding the call may give rise to the issue of whether the consent was voluntary, and evidence of coercion may negate the consent implied by the party knowingly agreeing to the recording. As the court in *Antoon* noted, "consent is not voluntary merely because a person makes a 'knowing' choice among alternatives." *Id.* at 203.

This two-step analysis of consent (whether the participant knew the officers were going to record the conversation and whether the participation was voluntary) is ineluctably necessary to protect free choice and is guided by the determination of consent in the context of Fourth Amendment search and seizure issues. *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996) (setting forth the two-step test in the Fourth Amendment context: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion") (internal quotations omitted).

▮ Applying Fourth Amendment standards, consent to a search is not voluntary if, under the totality of the circumstances, "the police conduct would have

---

5. Thus, the *Davis* court ignored any distinction between the two tests.

6. The government relies on *Antoon*, discussed below.

communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir.1994) (*Little I*) (quoting *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991)). The ultimate test is whether the person's free will "has been overborne and [her] capacity for self-determination critically impaired." *Schneckloth v. Busta-monte*, 412 U.S. 218, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)). This standard is objective rather than subjective and focuses on " 'the coercive effect of police conduct, taken as a whole,' on a reasonable person." *Little I*, 18 F.3d at 1504 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)); *United States v. Hernandez*, 93 F.3d 1493 (10th Cir.1996) (defendant's subjective belief is not determinative). The "particular personal traits or subjective state of mind of the defendant" may become relevant, however, if the police officer knows of the personal traits or characteristics and they influence his or her conduct. *Little I*, 18 F.3d at 1505.

▮ Factors approved by the Tenth Circuit that I may consider, none of which are dispositive alone, include the location of the encounter, whether the police advised Field of her rights to refuse to answer questions and to terminate the encounter, and the manner of the questioning. *Little I*, at 1503, 1505; *United States v. Little*, 60 F.3d 708, 712 (10th Cir.1995) (*Little II*) (" '[a]ccusatory, persistent, and intrusive' questioning can turn an otherwise voluntary encounter into a coercive one"). In addition, because the officers clearly were aware of Field's pregnancy (and her relation to Shuler) and acted upon it by telling her

Shuler would not help her and that she faced having her baby in jail, I may take these characteristics into account in resolving the consent issue.[7]

The facts of this case are more imposing or intrusive on Field and her free will than those found to warrant suppression of statements and a search of baggage in *Little II*. The Tenth Circuit upheld the suppression, based on the district court's findings that the questioning of the defendant occurred in a confined space outside of public view; that the questioning was accusatory, persistent, and intrusive; and that the officer had failed to advise the defendant she had right to refuse to answer or to refuse to accompany him to the baggage area. 60 F.3d at 713. As is the case here, the court noted that the officer did not have probable cause to arrest the defendant.

▮ Given the oppressive nature of the facts of this case, *i.e.*, Field's age, pregnancy, and apparent lack of sophistication; the overwhelming police presence at the initial stop; the "escort" to the Sheriff's Office sandwiched between two police cruisers and accompanied by a police passenger; the length, persistence, intrusiveness and accusatory nature of the questioning by multiple officers on a tag team basis; the threats that Field and her mother were implicated in the robbery and that Field might have her baby in jail; six hours of perceived detention; the need of a key to leave the area where she was questioned; and the officers' failure to advise Field she could leave, it was objectively reasonable for Field to conclude that she was not free to decline the request to participate in the phone call to defendant.

The government disregards these circumstances and argues, via the officers' testimony, that Field's consent was valid

---

**7.** Comments or threats regarding pregnancy or separation from a child may be viewed as coercive, depending upon the circumstances. *See United States v. Perdue*, 8 F.3d 1455, 1468 (10th Cir.1993) (officers "explained" possibility that defendant would be separated from his

child). *See also United States v. Hatley*, 15 F.3d 856, 858 (9th Cir.1994) (consent to search vehicles invalid where deputy inappropriately threatened to take defendant's child into custody; search upheld on other grounds).

**1160**

based on her demeanor, waiver of rights and statements that her concern was whether the defendants would learn of her involvement in the investigation. The government relies on *United States v. Antoon*, 933 F.2d at 203, in which the Third Circuit found that a co-conspirator's decision to wear a body microphone was not coerced merely because he was forced to choose between two unappealing alternatives. It was the co-conspirator's "apprehension of prosecution that persuaded him to cooperate, not any coercive statement or intimidation by any law enforcement official." *Id.* at 205. He stated that no one directly threatened to prosecute him if he refused to cooperate. "While it may be true that he felt trapped (although he never used that word himself), there is no indication that [the co-conspirator] did anything but knowingly and intentionally choose between two unpleasant alternatives." *Id.*

I agree with defendant that this case is distinguishable from *Antoon*. There the co-conspirator met with the FBI several times over the course of nine days before he consented to wear the body recorder, the first meeting took place at his home, and he accepted invitations to subsequent meetings at the FBI office. There were no direct threats of prosecution or jail, and the co-conspirator had time to consider the request. *Id.* He testified that, faced with the knowledge that the government had substantial evidence against him, he "voluntarily decided to cooperate." *Id.* at 206. That scenario differs markedly from the circumstances presented here.

Under the totality of the circumstances before me, I conclude that the government has failed to prove by a preponderance of the evidence that the consent given here was voluntary. A reasonable person in Field's position, subjected to the coercive effect of police conduct, may well have had her free will overborne and believed she could not refuse to participate in the telephone call to defendant Moore.

Accordingly, it is ordered that defendant's motion to exclude evidence of tape recorded conversations, filed August 3, 1999, is granted.